## UNITED MINE WORKERS OF AMERICA et al. v. PENNSYLVANIA MINING CO.*

(Circuit Court of Appeals, Eighth Circuit. July 12, 1924.)

No. 5772.

1. **Monopolies** &⇒28—**Evidence held insufficient to show international union's participation in conspiracy to restrain interstate commerce.**

Evidence *held* insufficient to show international labor union's participation in conspiracy to restrain interstate trade in coal by excluding plaintiff's open shop coal from interstate commerce.

2. **Monopolies** &⇒28—**Evidence held insufficient to show acts of labor union directly intended to restrain interstate commerce.**

Evidence *held* insufficient to show direct intention of local labor union to interfere with interstate commerce in conducting strike against open shop coal operators.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Action by the Pennsylvania Mining Company against the United Mine Workers of America and others. Judgment for plaintiff, and defendants bring error. Reversed and remanded, with directions.

Henry Warrum, of Indianapolis, Ind., and William A. Glasgow, Jr., of Philadelphia, Pa. (G. L. Grant, of Ft. Smith, Ark., on the brief), for plaintiffs in error.

Walter Gordon Merritt, of New York City (Daniel Davenport, of Bridgeport, Conn., James B. McDonough, of Ft. Smith, Ark., Thomas Hewes, of Hartford, Conn., Paul McKennon, of Clarksville, Ark., and Walter A. Hardman, of New York City, on the brief), for defendant in error.

Before SANBORN, LEWIS, and KENYON, Circuit Judges.

KENYON, Circuit Judge. In the interest of convenience parties will be designated as in the District Court.

Plaintiff is a corporation, organized under the laws of the state of Delaware, and engaged in the business of mining coal in Johnson county, Ark. More than 80 per cent. of its product is sold in other states and carried in interstate commerce.

Defendants are the United Mine Workers of America, district No. 21 of the United Mine Workers of America, certain organizers, officers, agents, and employés of the United Mine Workers of America and of district No. 21, and a large number of local unions of the same general organization.

The complaint consists of two counts—one based on the federal Anti-Trust Act (Comp. St. § 8820 et seq.), and the other on the com-

---

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied November 10, 1924.

mon law. During the progress of the trial the court required plaintiff to elect on which count it would proceed, and election was made to rely on the count based on the Anti-Trust Act. The case was tried and judgment rendered on the theory of a violation of that act. Plaintiff claimed that the United Mine Workers of America and the other defendants were engaged in a combination or conspiracy to restrain interstate trade in coal by excluding open shop coal from interstate commerce, and that in carrying out such purpose they endeavored to destroy all open shop mining operations.

Plaintiff sought to establish the general conspiracy in restraint of interstate commerce as follows:

First. By showing from the records of the joint conferences between operators and representatives of the unions in the central noncompetitive field (Western Pennsylvania, Ohio, Indiana, and Illinois), extending over a period from 1898 to 1918, statements of operators and representatives of the union with relation to the purposes of both parties in unionizing the nonunion fields, and in relieving the operators employing union labor from the competition of those employing nonunion labor. Many of the statements hark back to the original agreement made at the joint conference of the central competitive field at Chicago in 1898, a part of which is as follows: (8) That the United Mine Workers' organization, a party to this contract, do° hereby agree to afford all possible protection to the trade and to other parties hereto against any unfair competition resulting from a failure to maintain scale rates. This seems to be the foundation upon which the alleged conspiracy was builded. The statements in evidence tend to show that the United Mine Workers and many of the operators in the central competitive field were doing everything they could to prevent the production of nonunion coal.

Second. Statements made by delegates to the various conventions of the United Mine Workers from 1904 to 1916.

Third. Proceedings of the conventions of district No. 21 and reports of officers thereof to the national convention of the United Mine Workers.

Fourth. Statements, articles, and editorials published in the United Mine Workers' Journal, the official organ of the United Mine Workers of America, showing the general purpose to exclude nonunion produced coal from competition with that produced by union mines.

Fifth. Evidence of proceedings of joint conferences of Southwestern Coal Operators' Association, proceedings of the joint conferences of Texas miners and operators, committee reports in the various conferences, and speeches and statements of officers, both of the national union and subsidiary local unions.

Sixth. The calling of a strike in June, 1918, of the employés of plaintiff, which it is claimed was a part of the general conspiracy to prevent plaintiff from producing and selling open shop coal in interstate commerce.

The evidence tended to show that the alleged conspiracy was carried out in a way to injure the business of plaintiff from November, 1910, up to the time of the strike, June 8, 1915, and on through the strike period to December 6, 1915. This was done by a general plan and

process of inducing men to leave plaintiff's plant; the sending in of organizers to assist in breaking up plaintiff's working organization; a campaign under one of the national organizers named King to prevent plaintiff from securing employees; the use of threats and physical violence to drive away employees; the issuance of alleged libelous circulars by the publicity agent for district No. 21; the visit of certain defendants, including a national organizer named Britton, to Scranton, Pa., for the purpose of injuring plaintiff's standing among its stockholders; the calling of the strike, before referred to, in June, 1915, and thereafter the establishment of a tent colony near the plaintiff's mining camp, out of which proceeded continuous acts of intimidation; the threatening of men employed by plaintiff; inflammatory speeches and actions; the visit to the tent colony of national organizers; the attempted blowing up of the railroad bridge on the spur track of the Missouri Pacific Railway Company leading to plaintiff's plant; and other destructive and unlawful acts which created a general atmosphere of terrorism and prevented plaintiff from operating its property to its full capacity.

Plaintiff contended that, had it not been for the action on the part of defendants in carrying out the alleged unlawful conspiracy, it would have normally employed about 250 men, and would have mined 500 tons of coal a day, upon which it would have realized a very large profit.

Defendants, on the other hand, claimed that the predecessors of plaintiff company operated a coal mine with nonunion labor from 1907 until October, 1910, and that the business was changed from union to nonunion plan, and that plaintiff company was organized under the laws of another state in order to have the benefit of federal law during the fight for the open shop, and that plaintiff, in order to carry on said fight, imported miners from other fields; that the imported parties were foreigners, and their presence aroused intense feelings of antagonism in the county in which the plaintiff plant was situated, and that this supplied the local motive for the trouble; that the fight against plaintiff was a fight against the methods employed to nonunionize the plant; that the strike arose in part because of what was known as the screening law of Arkansas, said law being passed in 1915 by the General Assembly of Arkansas, which excepted the portion of Johnson county where plaintiff's plant was located from the general mine-run law throughout the state; prior thereto a mining company was required to weigh the coal before screening it and to pay its employees on the mine-run basis; under this act the coal would be screened before weighing, and consequently the coal miners lost a considerable portion of their wages; that this condition of affairs brought about the strike without the solicitation of the union; that after the strike was called the union assisted in the establishment of a tent colony and in taking care of the men. Various countercharges as to the conduct of plaintiff's employees were also made.

Upon submission of the case to the jury, a verdict for plaintiff was returned in the sum of $100,000, which under the law was trebled by the court. The record in this case is voluminous. There are 184 assignments of error. We find no necessity for discussing the various as-

signments of error, as the determination of some fundamental propositions is, in our opinion, decisive of the case.

The Supreme Court of the United States, on June 5, 1922, filed its opinion in the case of United Mine Workers of America et al., Plaintiffs in Error, v. Coronado Coal Co., Defendant in Error, 259 U. S. 344, 42 Sup. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. That case will hereafter be referred to as the Coronado Case. It is a companion case to this, and was commenced in the United States District Court for the Western District of Arkansas in September, 1914. A verdict was returned at the trial for the sum of $200,000, which was trebled by the court by virtue of the provision of the Anti-Trust Act authorizing the same. The case came to this court by writ of error, and the judgment was affirmed, except on a certain question of interest. United Mine Workers of America et al. v. Coronado Coal Co. et al., 258 Fed. 829, 169 C. C. A. 549. In the opinion before referred to the Supreme Court of the United States reversed the judgment.

The present case was commenced in December, 1915, and the trial took place and judgment was rendered before the decision of the Coronado Case by the Supreme Court of the United States. These cases both arose in the same state and under very similar conditions. It is conceded by counsel for plaintiff that in order to sustain the judgment in this case the facts must be distinguished from those in the Coronado Case. The Supreme Court in that case considered separately in its opinion the questions of liability as to the international union et al. and as to district No. 21. As to the international union it held that its liability was a question of actual agency, which the constitutions of the two bodies conclusively settled, but said:

"If the international body had interfered, or if it had assumed liability by ratification, different questions would have arisen."

It decided that the strike there involved was a local strike, and that the record did not show any ratification of the same by the international body in the method prescribed by its constitution, and that the evidence did not show participation of the international body in the strike. It was claimed there, as here, that the acts of President White of the international union were sufficient to show a ratification upon the part of that body as to the strike, and the Supreme Court said:

"It would be going very far to consider such acts of the president alone a ratification by the international board creating liability for a past tort. The president had not authority to order or ratify a local strike. Only the board could do this."

And the court held that, as to the international board, the United Mine Workers of America, its president, and other officers, the jury should have been directed to return a verdict for them; the evidence not being sufficient to show that the international board authorized, participated in, helped to maintain, or ratified the strike.

As to the liability of district No. 21, its officers, and the local unions, the Supreme Court held that it was responsible for the actions of its members resulting in the destruction of plaintiff's property under a general common-law liability. But it also held that, the case being based on the federal Anti-Trust Act, in order to make the district re-

sponsible thereunder, it must be shown that the conspiracy upon which the action was founded as to the Bache-Denman mines must have had as its direct intent the restraining and monopolizing of interstate commerce, and that such intent was not shown, either directly nor by circumstances from which the same could be inferred.

Is the case we are now considering distinguishable from the Coronado Case? While some differences may be found in the evidence in the two cases, and while there is some evidence in this case additional to that in the Coronado Case, yet as to fundamentals the evidence is substantially the same. By agreement of counsel a large part of the evidence in the Coronado Case was used verbatim in this case. The cases were tried on exactly the same theory. The strike here was called by the officials of the same district—No. 21. The properties of the two companies were not far distant from each other. Similar circumstances surround both cases. The same joint conference statements, with some exceptions, appear here as in the Coronado Case; likewise reports of the national conventions of the United Mine Workers; some of the same articles in the official organ known as the United Mine Workers' Journal; some of the same speeches, such as that of President White of the national union, where he refers to the boys marching in on Bache, kicking his Colorado guards out, breaking their jaws, and putting the flag of the United Mine Workers on top of the tipple; some of the same resolutions, such as that referred to by the Supreme Court, proposed in the general convention of the union of 1914 with reference to the Colorado strike.

[1] As to the liability of the international board, it is urged that the evidence of witness Moran, an international board member, distinguishes this case from the Coronado Case, and is sufficient to show participation by the international board. It is in the record that Moran stated to the president of plaintiff company, "We spent $200,000 fighting you in Jamestown." Also in evidence is the letter of Moran to the president of plaintiff, with reference to the removal of the tent colony from the hill, and referring to the suit brought against the United Mine Workers of America, stating:

"Now if your company is willing to withdraw the suit before mentioned, we will certainly remove the tent colony, and I have no doubt make a working agreement with you."

That one member of the board so expressed himself is not sufficient to show participation in the strike or ratification by the board. The Supreme Court held in the Coronado Case that the president of the board had no authority to order or ratify a local strike; that such ratification could only be by the board. There is no authority appearing on the part of Moran to speak for the board. While there are other fragments of evidence, somewhat different from the evidence in the Coronado Case, the strongest evidence is that of Moran, which, in view of the decision of the Supreme Court, is not sufficient to establish ratification of the strike on the part of the international union. We are unable to see that the evidence in this case to show participation by the international union is any stronger than in the Coronado Case. If insufficient there, it is certainly insufficient here.

[2] As to district No. 21 and its liability under the Anti-Trust Act, the only substantial difference in the evidence in the two cases bearing on the direct intent of the conspiracy, and which is especially emphasized in argument, is the alleged attempt of defendants to blow up a certain bridge on the spur track of the Missouri Pacific Railway Company leading to plaintiff's plant, and over which the cars of coal passed in interstate commerce. Speaking of the evidence in the Coronado Case as to conspiracy to restrain interstate commerce, the Supreme Court said:

"What really is shown by the evidence in the case at bar, drawn from discussions and resolutions of conventions and conference, is the stimulation of union leaders to press their unionization of nonunion mines not only as a direct means of bettering the conditions and wages of their workers, but also as a means of lessening interstate competition for union operators which in turn would lessen the pressure of those operators for reduction of the union scale or their resistance to an increase. The latter is a secondary or ancillary motive, whose actuating force in a given case necessarily is dependent on the particular circumstances to which it is sought to make it applicable."

That is exactly what the evidence here shows as to the purpose of the conspiracy. In that case it was charged that there was a continuous operating conspiracy between union coal operators and the international union, the same as charged here, to restrain interstate commerce in coal, and it was also claimed there, as here, that the work of district No. 21, was a step in that conspiracy. Referring to this the Supreme Court said that coal mining is not interstate commerce, and that the power of Congress did not extend to its regulation as such, and pointed out that, while obstruction to coal mining might prevent coal from going into interstate commerce, it "is not a restraint of that commerce unless the obstruction to mining is intended to restrain commerce in it or has necessarily such a direct, material and substantial effect to restrain it that the intent reasonably must be inferred." It held that the intent to restrain interstate commerce could not be inferred from the fact that the production of 5,000 tons a week, which the Bache-Denman mines could produce, might be prevented; that it would have no appreciable effect upon the price of coal or nonunion competition.

Here the production of the plant running at full capacity is shown by the evidence to be less than the highest production in the mines involved in the Coronado Case. Hence there could be no inference here, based upon amount of production alleged to be prevented, of an intent to restrain interstate commerce. The evidence not showing any inferred intent to restrain such commerce by reason of the effect upon production, is there sufficient evidence to show a direct intent on the part of the alleged conspirators constituting district No. 21, its subsidiary unions, and the members thereof, to directly restrain interstate commerce?

We have heretofore referred to one alleged difference, viz. the attempted blowing up of a bridge on the stub track leading to a mine, and over which the cars of coal must pass in interstate commerce. It is strongly urged by counsel that this shows a direct intention to interfere with such commerce, and reliance is largely placed on this circumstance to distinguish the two cases as to this point. It must be re-

membered, however, that in the Coronado Case a car loaded with coal, billed to a point in Louisiana and in the hands of the railroad company for shipment, was burned by the conspirators. That car was in interstate commerce. The court said that it was a part of the general destruction, and that the circumstance had no particular significance. They did point out, and in that there is some difference from the bridge incident here, that the car had been used by some of Bache's men for defense in the battle resulting in the destruction of the property. The attempted blowing up of the bridge was a part of the general destructive tactics employed, the same as the destruction of the car in the Coronado Case. And while it bears on the question, of course, of intent, it is hardly adequate in itself to establish the direct intent upon the part of the alleged conspirators to restrain interstate commerce. The decision in the Coronado Case settles to a large extent the law of this case. The court there carefully distinguished between such cases as Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, where the direct object of attack was interstate commerce, and United States v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, where the conspiracy was to bring the entire cotton trade under the influence of a cotton corner and such cases as the case at bar.

In the brief of defendant in error in this case several pages are devoted to an argument to show that the case is within the doctrine of this court as announced in United Leather Workers' International Union et al. v. Herkert & Meisel Trunk Co. et al., 284 Fed. 446. Very recently the Supreme Court of the United States reversed the judgment of this court sustaining the judgment of the trial court in that case (44 Sup. Ct. 623, 68 L. Ed. ——), and filed an opinion in which it reiterates some of the propositions laid down in the Coronado Case. It certainly in no way weakens the opinion in the Coronado Case, but emphasizes that the conspiracy to warrant recovery under the federal Anti-Trust Law must be founded on an intent directly to restrain interstate commerce, and in referring to the cases of Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 Sup. Ct. 101, 66 L. Ed. 227, United Gas Co. v. Hallanan, 257 U. S. 277, 42 Sup. Ct. 105, 66 L. Ed. 234, Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 Sup. Ct. 106, 66 L. Ed. 239, and Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 Sup. Ct. 244, 66 L. Ed. 458, says:

"None of these cases, although they all illustrate the practical conception of interstate commerce as a flowing stream from one state to another, formed by a regular course of business, can properly be said to support the argument that mere intentional cutting down of manufacture or production is a direct restraint of commerce in the product intended to be shipped when ready, or to be any departure from the general rule last announced in the Coronado Case, and uniformly applied in all the cases referred to above, which it followed. The effect upon interstate commerce in the four cases just cited, on the other hand, was directly burdensome and restraining."

Again, on the necessity of an intent directly to restrain interstate commerce, and referring to the somewhat famous Knight Case, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, the court says:

"But the Knight Case was a far stronger case for federal jurisdiction under the Anti-Trust law, because of the probable relation between the monopoly

of manufacture and sale in interstate commerce, than the case at bar, in which there is present no element of intended and probable monopoly or discrimination in interstate commerce. The same element was lacking in the Coronado Case."

The apparent object of the alleged conspiracy in this case as to district 21 was to prevent the production of nonunion mined coal at the Bache-Denman plant. That was the purpose of the strike. The effect upon interstate commerce was incidental. The Sherman Anti-Trust Act does not afford a remedy under such circumstances to the injured operator.

We are satisfied that, under the record in this case, the authorization of, participation in, or ratification by the international organization is not shown; that as to district No. 21, its officers, and the subordinate unions the record fails to sustain the claim of a direct intent to restrain interstate commerce as a part of the conspiracy. And, as we have heretofore pointed out that the coal production affected is less than in the Coronado Case, no inference of an intent to restrain interstate commerce can arise.

We have carefully examined the record in this case in an endeavor to find substantial points of difference as to the alleged conspiracy here and its intention, and effect upon interstate commerce, from those in the Coronado Case. We are unable so to do. It requires a strained construction of the evidence and a challenge to the law as laid down in the Coronado Case by the Supreme Court to differentiate these cases. The decision of the Supreme Court in that case is not only guiding but controlling here.

We do not pass upon other questions raised, as those we have considered are decisive of this case. Viewing the matter as we do, we have refrained from an extended discussion of the evidence and the multiplicity of minor questions raised. The judgment is reversed, and the case remanded, with directions to grant a new trial.