### FINLEY et al. v. UNITED MINE WORKERS OF AMERICA et al.

(Circuit Court of Appeals, Eighth Circuit. July 12, 1924.)

No. 6541.

1. **Appeal and error** �köö1097(1), 1195(1)—**Questions of law determined on writ of error or appeal are law of case.**

Questions of law determined on writ of error or appeal are law of case, both for trial court and Circuit Court of Appeals on second writ of error or appeal, provided facts remain substantially the same.

2. **Monopolies** ⊚ö28—**Evidence held insufficient to show international union's participation in conspiracy to restrain interstate commerce.**

3. **Monopolies** ⊚ö28—**Evidence held insufficient to show acts of local labor union were directly intended to restrain interstate commerce.**

Evidence *held* insufficient to show direct intention of local labor union to interfere with interstate commerce in conducting strike against open shop coal operators.

⊚ööFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of Arkansas; John C. Pollock, Judge.

Action by Clyde H. Finley, receiver of the Coronado Coal Company, and others, against the United Mine Workers of America and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

Henry S. Drinker, Jr., of Philadelphia, Pa. (James B. McDonough, of Ft. Smith, Ark., and Edwin A. Lucas, of Philadelphia, Pa., on the brief), for plaintiffs in error.

William A. Glasgow, Jr., of Philadelphia, Pa. (G. L. Grant, of Ft. Smith, Ark., and Henry Warrum, of Indianapolis, Ind., on the brief), for defendants in error.

Before SANBORN, LEWIS, and KENYON, Circuit Judges.

KENYON, Circuit Judge. This is the third appearance here of this case. The first time the correctness of the ruling of the United States District Court, Western District of Arkansas, in sustaining a demurrer to the complaint was challenged. Dowd v. United Mine Workers of America et al., 235 Fed. 1, 148 C. C. A. 495.

The second time the case was brought to this court it was upon writ of error to review the proceedings of the District Court resulting in a judgment against the present defendants in error. United Mine Workers of America et al. v. Coronado Coal Co. et al., 258 Fed. 829, 169 C. C. A. 549. This court affirmed the judgment of the trial court, outside of a question of interest.

The case then proceeded on its way to the Supreme Court of the United States, where it was reversed and remanded to the District Court. United Mine Workers of America et al. v. Coronado Coal Co. et al., 259 U. S. 344, 42 Sup. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762.

On the second trial of the case in the United States District Court for the Western District of Arkansas no new pleadings were filed. The issues were the same, and at the close of the evidence the court directed a verdict for the defendants in error, holding that the evidence did not show that the direct purpose of the alleged conspiracy was to interfere with or monopolize interstate commerce, that the interference with such commerce was incidental, and hence that plaintiffs in error could not recover under the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

The Coronado Coal Company is now in the hands of a receiver, Clyde H. Finley. Plaintiffs in error bring writ to this court and ask for a reversal of the judgment of the trial court.

[1] I. The facts giving rise to this cause of action are set out fully in the previous decision of this court in 258 Fed. 829, 169 C. C. A. 549, and in United Mine Workers of America et al. v. Coronado Coal Co. et al., 259 U. S. 344, 42 Sup. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. They need not be repeated here. They relate to the alleged actions of defendants in error in destroying plaintiffs in error's property.

It is the well-established doctrine of the federal courts that questions of law determined on a writ of error or appeal are the law of the case both for the trial court and this court on a second writ of error or appeal, provided the facts remain substantially the same. Thatcher

v. Gottlieb, 59 Fed. 872, 8 C. C. A. 334; Guarantee Company of North America v. Phenix Ins. Co. of Brooklyn, N. Y., 124 Fed. 170, 59 C. C. A. 376; National Surety Co. v. Kansas City Hydraulic Press Brick Co., 182 Fed. 54, 104 C. C. A. 494; Town of Fletcher v. Hickman, 208 Fed. 118, 125 C. C. A. 346; Meyer & Chapman State Bank v. First Nat. Bank of Cody (C. C. A.) 291 Fed. 42.

The Supreme Court of the United States, passing on the former record, held as to the international union that the strike involved was a local one, declared by officers of district No. 21, which embraced Arkansas, Oklahoma, and Texas; that the circumstances were ample to supply a full local motive for the same; that the international board was not shown to have authorized the strike or participated therein; that the acts of President White of the international union, consisting of certain speeches, extracts from which are set forth in the Supreme Court opinion, did not amount to a ratification by the international board, saying:

"It would be going very far to consider such acts of the president alone a ratification by the international board creating liability for a past tort. The president had not authority to order or ratify a local strike. Only the board could do this."

Again on this question the Supreme Court said:

"It is a mere question of actual agency, which the constitutions of the two bodies settle conclusively. If the international body had interfered, or if it had assumed liability by ratification, different questions would have arisen."

It decided that a verdict should have been instructed by the trial court for the international union, the United Mine Workers of America, its president, and other officers.

As to district No. 21 and its liability, the holding in brief was that, to make a case against the district under the Sherman Anti-Trust Act, it must be shown that the conspiracy to attack the Bache-Denman property and stop the nonunion employment there was with the intent to restrain interstate commerce and to monopolize the same, and to subject it to the control of the union; that the intent to injure, obstruct, or restrain interstate commerce must appear as an obvious consequence of what was to be done, or be shown by direct evidence or other circumstances. The court expressed itself on this subject as follows:

"And so, in the case at bar, coal mining is not interstate commerce, and obstruction of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint of that commerce, unless the obstruction to mining is intended to restrain commerce in it, or has necessarily such a direct, material, and substantial effect to restrain it that the intent reasonably must be inferred."

And it held that, while the evidence might be sufficient to show a common-law liability as to district No. 21 for the acts of its members, it did not show a direct intent to restrain interstate commerce, nor that a sufficient amount of coal production was affected, to supply the inference of an attempt to restrain such commerce, and concluded with the statement:

"The result of our consideration of the entire record is that there was no evidence submitted to the jury upon which they properly could find that the

outrages, felonies, and murders of district 21 and its companions in crime were committed by them in a conspiracy to restrain or monopolize interstate commerce. The motion to direct the jury to return a verdict for the defendants should have been granted."

[2] II. Is there such substantial change in the evidence in the present record as to make this a new case from the one decided by the Supreme Court? The trial court evidently concluded there was not. Plaintiffs in error urgently insist there is, and that the link missing in the former trial to make the local situation a step in an actionable conspiracy to restrain the freedom of interstate commerce, which the Sherman Anti-Trust Act was intended to prevent, has been supplied.

We refer first to some of the matters in this record, not in the former one, claimed to create a different case from that passed on by the Supreme Court as to the responsibility of the international organization. It is urged that the present record shows the international organization to be a co-conspirator. While the same language may not appear in the former record bearing on this question, the same thing in effect was urged. The Supreme Court discussed whether or not the international organization was shown to have initiated, participated in or ratified the interference with plaintiffs in error's business, and held it was not. The broad proposition of the international organization co-operating with the alleged conspirators and as a part thereof was before the Supreme Court. Indeed, all the various theories of liability of the international organization were there considered. There are a few extracts from the proceedings of district No. 21 appearing in this record and not in the former one. Some of them relate to speeches of National Secretary-Treasurer Green, and National Vice President Hayes, but these extracts are not different from other speeches appearing in the record of members of the organization.

The claim is also made by plaintiffs in error that the present record shows the plan for destruction of plaintiffs in error's business and property was originated by National President White, and carried out pursuant to his express order, and the White speech at the special convention of district No. 21 held May 8, 1914, is referred to in extenso to sustain this claim. Extracts from this speech were before the Supreme Court when it considered the former case. It is claimed, however, that the testimony of the witness McNamara, who is a new witness, supplements this speech in a way to show active participation of White. The main new evidence in the present record is concededly the evidence of witness McNamara. A part of his testimony is as to a conversation at Ft. Smith with District President Stewart, some time after the speech of White, before referred to. McNamara testifies that Stewart told him "that he had been up to Kansas City and had a talk with White, and that they had arranged a 'plan' up there to prevent Bache from producing coal." McNamara also testifies to a conversation with White in which he said:

"We must prevent that coal from getting into the market, because, if Bache coal, scab-dug coal, got into the market, it would only be a matter of time until every union operator in that country would have to close down his mine or scab it, because the union operators could not meet Bache competition."

Further in the same conversation White said:

"He didn't want the national organization mixed up in this case; * * * we have West Virginia and Colorado on our hands, and we cannot bear any more fights."

The Supreme Court has held the strike to be a local one. The international organization, by its constitution, had settled the manner by which it would participate in a local strike. The Supreme Court in this particular case has held that President White had no authority to order and ratify a local strike; that only the board could do this. If no one but the board could ratify a local strike, and if this was a local strike, both propositions being directly decided by the Supreme Court, then the purported statements of White, if made to McNamara, could not amount to a ratification, nor could they show a participation by the board. In fact, it appears from one of the statements that White did not want the national organization mixed in the affair.

It is also urged that the record now shows that White had the power between meetings of the board to do everything that the board could do, and that consequently he stood in the place of the board. This contention is based on the minutes of the international executive board of September 13 to September 18, 1915, and refers to and is entitled "West Virginia Case," and is in reference to the granting of financial assistance to the miners there. The excerpts are as follows:

"The committee's report was read by Board Member Harlin.

"Board Member Haggerty: In order that the matter be subject to first approval, I move that that part of the committee's report be tabled. That part sets down a definite policy on which we must act. I leave the matter in the hands of the president, so that he can act.

"President White: I have been lenient with my prerogatives, and have always recognized that I was but the servant of the board, who are all in turn the servants of the organization. I do not understand that the committee's report in any way with the prerogatives set forth in the constitution, devolving upon the president.

"Board Member Harlin: The report of the committee as read expresses my opinion; no argument, whatever, could change it. So far as I am personally concerned, I do not believe I would have the authority to attempt to curtail the well-recognized authority of the president between board meetings. In every case that arises between board meetings, it is the prerogative of the president to exercise his judgment, subject to review by the international board. In regard to this situation as it has been presented to us, this recommendation expresses my opinion; there has been no argument that would justify me in supporting a motion to strike out any portion of it. I intend to stand on the recommendation as read."

In this, Board Member Haggerty seems to construe the power of the president, as to matters arising between board meetings, to exercise his judgment, subject to review by the international board. The minutes here were with relation to a situation in West Virginia, the facts and circumstances concerning which are not in the record. In these minutes it appears that White expressly stated that he was the servant of the board, and there is nothing to show that he construes his power as Haggerty construes it. Be this as it may, White's actions, as bearing on the question of ratification or participation for the international organization, were before the Supreme Court, and while these partic-

ular minutes, with the construction of power as given by Haggerty, were not before the court, they had the speech of White so frequently referred to in this case, and commented unfavorably upon his actions. The McNamara testimony, while bearing on the same question as to White's interference and participation, is merely cumulative. Its effect is weakened somewhat by the statements of White that he did not want the national organization to become a party to the affair. The minutes, introduced to show his power between meetings, amount simply to that construction of his power by Board Member Haggerty, and that construction is in conflict with the construction given by the Supreme Court when it said:

"The president had not authority to order or ratify a local strike. Only the board could do this."

The Supreme Court has squarely held that under the constitution of the international organization there was no power in the president to commit it to a strike without the action of the board. That is the settled law, as we view it, of this case.

[3] III. As to district No. 21 and liability thereunder, the Supreme Court held that the evidence was sufficient to show that said district and the individual defendants connected therewith participated in a plot to deprive plaintiffs in error of their employees by intimidation and violence, and in the course of carrying out the plot destroyed their properties, and that a common-law action for damages could be sustained; but it held that while, under the general doctrine of agency, the district was responsible, the things done were not in pursuance of a conspiracy to restrain and monopolize interstate commerce, and consequently there could be no recovery against the district under the Sherman Anti-Trust Act, saying:

"It was necessary, however, in order to hold district No. 21 liable in this suit under the Anti-Trust Act, to establish that this conspiracy to attack the Bache-Denman mines and stop the nonunion employment there was with intent to restrain interstate commerce and to monopolize the same, and to subject it to the control of the union." ·

The court goes into an extended review of the various resolutions introduced in the district meetings, speeches of various operators and miners, and after careful consideration of all the evidence arrives at this conclusion:

"What really is shown by the evidence in the case at bar, drawn from discussions and resolutions of conventions and conference, is the stimulation of union leaders to press their unionization of nonunion mines, not only as a direct means of bettering the conditions and wages of their workers, but also as a means of lessening interstate competition for union operators, which in turn would lessen the pressure of those operators for reduction of the union scale, or their resistance to an increase. · The latter is a secondary or ancillary motive whose actuating force in a given case necessarily is dependent on the particular circumstances to which it is sought to make it applicable."

The core of the matter is the following from the decision:

"And so, in the case at bar. coal mining is not interstate commerce, and obstruction of coal mining, though it may prevent coal from going into inter-

300 F.—62

state commerce, is not a restraint of that commerce, unless the obstruction to mining is intended to restrain commerce in it, or has necessarily such a direct, material and substantial effect to restrain it that the intent reasonably must be inferred."

The practical holding of the court therefore is: That the record was not sufficient to show a direct intent upon the part of the alleged conspirators to restrain or monopolize interstate commerce; that the intent was to unionize the mines as a means of bettering the conditions and wages of the workers, also to lessen interstate competition for union operators; that any effect on interstate commerce was incidental to the direct purpose to unionize the mines, and especially to prevent Bache from operating his mines with nonunion labor.

It is now claimed that new evidence is introduced showing a direct intention of the conspiracy to restrain interstate commerce; further, that reasons now appear, other than bitterness toward Mr. Bache, arising out of his breach of the contract to use union labor and the importation of foreign laborers, for the destruction of his property; and that the missing link referred to by the Supreme Court has been supplied as follows:

First. By proof of debates in conventions of the Southwest Miners' Association, participated in by district officials and by national officers, showing the insistence by the operators of protection from the competition of open shop operators reaching their markets.

Second. By the testimony of union operators in district 21, and by Hanraty, the former president of district 21, that the officers had continuously discussed competition of open shop coal, and by speeches made by national officers who attended the local conventions.

Third. The uncontradicted testimony of operators that, if permitted to operate open shop in 1914 without molestation by the union, the Bache-Denman Companies could have reduced their $1.75 per ton cost of production by from 50 cents to 80 cents per ton, and have increased the actual output of their mines from 5,000 tons a day to 7,500 tons per day.

Fourth. By testimony that Stewart and other district officers had discussed the impending competition of the Bache-Denman open shop coal in Oklahoma, Minnesota, and other states as a menace to their relations to the union operators.

Fifth. The testimony of witnesses as to the fact of stopping the shipment of coal being directly discussed among the miners; and

Sixth. The testimony of McNamara that the union miners had destroyed the property to prevent the plaintiffs from shipping its coal in interstate commerce.

The additional record as to debates in the Southwest Miners' Association, and statements of operators and miners as to nonunion coal being imported from other states, and the necessity of preventing the same is not new. There are hundreds of pages of the former record of statements of operators and miners in central competitive territory to the same effect. Nor does the new evidence of proceedings as to district No. 21, showing the feeling of the miners against the nonunion production of coal and the determination to avoid it, nor the dec-

larations by Stewart and Hanraty with reference thereto, and the general policy of district No. 21, present anything substantially new. The evidence of Mr. Hanraty, who was a new witness, shows that he was continually, during his connection with the miners' union, fighting against nonunion coal taking the union markets, and that it was the object of the miners to increase the cost of mining to the operators, and that he insisted on organization in Colorado and Alabama to create conditions so they could not produce cheap coal and take the markets from the union mines. This is the same line of evidence that fills the pages of the former record with the speeches of operators and union miners in the conferences of the competitive central field. Nor do we attach the same importance to witness Tharel's testimony as counsel for plaintiffs in error seem to. Tharel was a storekeeper at Midland in 1914, and testifies as to hearing union miners discuss the markets reached by the Bache-Denman Company, where union coal was sold. Of course, there was much discussion of this character. The unions were determined to stop the production of nonunion coal. They did not care, apparently, whether it interfered with interstate commerce or not. Their determined purpose was that Bache should not do busineess as a nonunion operator, and naturally every phase of the matter was the subject of discussion among the miners.

The Supreme Court in its opinion referred to the circumstance that a car loaded with coal and billed to a town in Louisiana was burned by the conspirators, and stated that the car had been used in a battle by some of Bache's men for defense, and that its burning was only a part of the general destruction. It is sought by the evidence in the present case to show that this is not the fact, and that the burning of the car was not a part of the general destruction; that not only this car, but others, were destroyed; and that this was the result of entirely independent actions.

The thought of the Supreme Court seems to have been that the burning of a car, even billed in interstate commerce and about to move on its way, was not sufficient to show a specific intent, but that it was a part of the general destructive tactics. The present record does not materially change this situation. There is no substantial difference here from the former case on the question of a direct intent to restrain interstate commerce on the part of district No. 21 and its membership.

On the presumed intent, because of the extent of coal production affected, it is claimed that the Supreme Court was mistaken in the figures set forth in the opinion as to the capacity of the Bache-Denman mines. This matter was presented to the Supreme Court in the petition for rehearing, and the claim of additional production was urged, but it does not seem to have changed their view. Apparently in its opinion the amount which could be produced at the Bache-Denman mines would have "no appreciable effect on the price of coal or nonunion competition" in the great national production of coal.

The Supreme Court, in its decision in this case, has emphasized the line of demarcation as to the application of the Sherman Anti-Trust Act to conspiracies, where the intent is directly to affect interstate commerce, and where such result is merely incidental. Since that de-

cision the Supreme Court of the United States in United Leather Workers' International Union et al. v. Herkert & Meisel Trunk Company et al., 44 Sup. Ct. 623, 68 L. Ed. ——, decided June 9, 1924, has reiterated some of the doctrines of the Coronado Case, as we have pointed out in an opinion this day filed in United Mine Workers of America v. Pennsylvania Mining Co., 300 Fed. 965. The federal courts again and again have held that the making of goods and the mining of coal are not commerce, and that obstruction to coal mining is not a direct obstruction to interstate commerce. They have repeatedly said that, to bring a case under the inhibition of the Sherman Anti-Trust Act, there must be a direct intent to restrain or monopolize interstate commerce. It seems a work of supererogation to review these cases. Many of them are grouped in United Leather Workers' International Union v. Herkert & Meisel Trunk Co., before referred to.

We think the trial court was correct when he said, in summing up this case and holding that the alleged conspiracy was for the purpose of unionizing the mines and of preventing Mr. Bache from working his mines nonunion:

"I don't think it can ever be a different case; but, while I think the conspiracy, at least to a certain point, is amply established, I don't think that there is evidence here that it was the direct purpose to interfere with or monopolize interstate commerce. It was for a different purpose, and that was a mere incident to it."

We are satisfied there is no such substantial change in the proof here from that of the former case determined by the Supreme Court as to constitute a new case. It is the same case; and the law announced there is the law of this case. Even granting the record here to be stronger than in the previous trial on the question of the intent of the alleged conspiracy, yet in the light of the decision there it fails to change the status of the international organization as to liability, and fails to show that the direct intent of the conspiracy as to district No. 21 and its officers and subsidiary unions was to restrain or monopolize interstate commerce.

The judgment of the trial court is affirmed.