## PENNSYLVANIA MINING CO. v. UNITED MINE WORKERS OF AMERICA et al.

Circuit Court of Appeals, Eighth Circuit. October 13, 1928.

No. 7474.

John W. Simpson, 2d, of New York City (James B. McDonough, of Ft. Smith, Ark., Paul McKennon, of Clarksville, Ark., Daniel Davenport, of Bridgeport, Conn., and Walter Gordon Merritt, of New York City, on the brief), for plaintiff in error.

Henry Warrum, of Indianapolis, Ind. (G. L. Grant, of Ft. Smith, Ark., on the brief), for defendants in error.

Before KENYON and BOOTH, Circuit Judges, and MUNGER, District Judge.

KENYON, Circuit Judge. Plaintiff in error seeks by this writ review of the decision of the District Court for the Western District of Arkansas directing a verdict in favor of certain defendants in error in a suit brought in 1915 by plaintiff in error to recover damages under the federal Anti-Trust Act, resulting from an alleged conspiracy to restrain interstate commerce in coal, against the International Union of the United Mine Workers of America (hereinafter designated as the International), John P. White, its president at that time,

other officers and organizers, District No. 21 of the United Mine Workers of America, its officers, and other local unions. The basis of the claim for damages was the alleged wrongful disruption of plaintiff in error's labor force by a systematic campaign to unionize its mines by unlawful methods.

This is the second appearance of the case in this court. On the first trial in the District Court a verdict of $100,000 in favor of plaintiff in error was returned, which was trebled by the court in accordance with the provisions of the federal statute, and judgment was entered for $300,000. Writ of error was taken to this court and the case was argued here in 1923, and subsequently re-argued at our request, together with a companion case brought by the Coronado Coal Company against the United Mine Workers of America and other defendants, which we shall refer to hereinafter. We withheld opinion until the decision of the Supreme Court of the United States in United Leather Workers v. Herkert & Meisel Trunk Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566, an appeal from a decision of this court in which were involved somewhat similar questions. That case was decided June 9, 1924, and on July 12, 1924, our opinion in this case was filed, reversing the trial court and holding the evidence insufficient to involve the International in the alleged conspiracy, or to show any direct intent of the defendants therein to restrain interstate commerce. United Mine Workers of America v. Pennsylvania Mining Co. (C. C. A.) 300 F. 965. Reference may be had to this opinion for a general statement of the facts. Upon retrial of the present case the trial court instructed a verdict for the International and John P. White and some of the other defendants, and submitted the case as to District No. 21 and all defendants not covered by the directed verdict to the jury. The jury failed to agree on a verdict. The only questions here relate to the ruling of the trial court directing a verdict in favor of the International and John P. White, and also certain rulings concerning the admission of evidence.

This case cannot be discussed without considerable reference to the Coronado Case, to which it bears close relationship. That case involved a strike and disturbances at the Bache-Denman mines at Prairie Creek, Sebastian county, Arkansas, a county adjoining Johnson county, in which the mines of plaintiff in error are situated. The trial of the first Coronado Case in the United States District Court for the Western District of Arkansas resulted in a verdict for the Coronado Company against the United Mine Workers of America et al. in the sum of $200,000, which was trebled by the court and judgment entered for $600,000. That judgment was affirmed by this court. United Mine Workers of America et al. v. Coronado Coal Co. et al., 258 F. 829. The Supreme Court, in United Mine Workers of America et al. v. Coronado Coal Co. et al., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, reversed the same. Our decision in United Mine Workers v. Pennsylvania Mining Co., 300 F. 965, reversing the judgment (which has not been reviewed by the Supreme Court), was based on our understanding of the decisions of the Supreme Court in United Leather Workers v. Herkert & Meisel Trunk Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566, and also in the first Coronado Case, where under substantially similar facts the Supreme Court held the International was not liable. On the second trial of the Coronado Case the trial court instructed a verdict for defendants, which was affirmed by this court. Finley et al. v. United Mine Workers of America et al. (C. C. A.) 300 F. 972. The Supreme Court, in Coronado Coal Co. et al. v. United Mine Workers of America et al., 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963, affirmed that decision of this court as to the nonliability of the International Union, but reversed it on the question of liability of District No. 21, and that case was returned again to the District Court for trial.

In the presentation of the case now under consideration it seems to us that counsel for plaintiff in error have failed to give weight to the situation presented and the status created by reason of the former decision of this court. The similarity of the evidence is recognized as they say: "In a general way, the evidence submitted, except in certain particulars, the most important of which will be called to the attention of the court, followed the same line of evidence which this court had before it on the previous appeal."

It is the well-established doctrine of the federal courts that, on a second writ of error or appeal, questions of law or fact determined upon the first hearing are not reconsidered, provided the evidence was substantially the same upon both trials. Under such circumstances questions of law determined on a writ of error or appeal are the law of the case, both for the trial court and this court on a second writ of error or

appeal. Thatcher v. Gottlieb (C. C. A.) 59 F. 872; Guarantee Co. of North America v. Phenix Ins. Co. of Brooklyn, N. Y. (C. C. A.) 124 F. 170; National Surety Co. v. Kansas City Hydraulic Press Brick Co. (C. C. A.) 182 F. 54; Town of Fletcher v. Hickman (C. C. A.) 208 F. 118; Meyer & Chapman State Bank v. First Nat. Bank of Cody (C. C. A.) 291 F. 42; Finley et al. v. United Mine Workers of America et al. (C. C. A.) 300 F. 972.

There should be and is an exception to this rule, viz.: If convinced that a former decision is clearly erroneous and unsound, and works manifest injustice to the parties, an appellate court should not deem itself bound as to such parties by the rule of "law of the case." It is the general practice of courts, however, "to refuse to reopen what has been decided." Messinger v. Anderson, 225 U. S. 436, 32 S. Ct. 739, 56 L. Ed. 1152; Chase v. United States (C. C. A.) 261 F. 833; Johnson v. Cadillac Motor Co. (C. C. A.) 261 F. 878, 8 A. L. R. 1023.

In our former opinion we discussed the methods by which plaintiff in error sought to establish the alleged general conspiracy to restrain interstate commerce and the relationship of the International thereto, and held that, guided by the decision of the Supreme Court in the Coronado Case, we could not hold otherwise than that the evidence was insufficient to show participation by the International in such conspiracy. We are now assisted in our consideration of the present case by the decision of the Supreme Court in the second Coronado Case. In both Coronado Cases the Supreme Court held that the liability of the International as to the strike and disturbances incident thereto must be governed by article 16 of the constitution of the United Mine Workers of America, which provides (section 1): "No district shall be permitted to engage in a strike involving all or a major portion of its members, without the sanction of an International convention or the International Executive Board."

In the first Coronado Case, United Mine Workers v. Coronado Coal Co. et al., 259 U. S. 344, 395, 42 S. Ct. 570, 578 (66 L. Ed. 975, 27 A. L. R. 762), the court said: "Here it is not a question of contract or of holding out an appearance of authority on which some third person acts. It is a mere question of actual agency which the constitutions of the two bodies settle conclusively. If the International body had interfered or if it had assumed liability by ratification, different questions would have arisen."

In the opinion of the Supreme Court in the second Coronado Case, Coronado Coal Co. et al. v. United Mine Workers of America et al., 268 U. S. 295, 301, 45 S. Ct. 551, 553 (69 L. Ed. 963), it said: "We thought at the first hearing and we think now that none of this evidence tends to establish the participation of the International in the Prairie Creek strike and disturbances."

In these cases Chief Justice Taft reviewed the entire constitution of the International Union, and the Supreme Court held the strike to be a local one, and the International not liable as a participant in the same, or in the disturbances incidental thereto. Much of the evidence in the Coronado Case is in this case. There was new evidence in the second trial of that case, some of which was attempted to be introduced in this case, and to which we later refer. The present record consists of some 2,600 pages; in the former case, over 3,600 pages.

The question must be candidly met as to whether the evidence here establishes a different case from the one involved in our former decision. We consider the question first as to the International. A great part of the evidence on this trial was, under a stipulation, read from the record in the former case. Much of the evidence in the former case was likewise, under a stipulation, read from depositions in the Coronado Case, evidencing the intimate relationship of the Coronado and this case.

The argument is presented that the International organization was carrying on, through National Organizers King and Britton, activities in organizing the mines of the country, including plaintiff in error's mines, and bringing the miners into the Miners' Union. This is shown by extracts from the Journal of the United Mine Workers, the Joint Conference proceedings, and the convention Reports, occupying some thousand pages of the record in the former case, and which were introduced or attempted to be introduced in the trial in this case by reading them from the record in the former case. With but few exceptions these extracts are identical.

There is some new evidence in this trial, to which we refer briefly: In the former case James K. Gearhart, an officer of plaintiff in error, testified to a conversation with Moran, an International Board member, with reference to settlement of difficulties and the removal of the tent colony at Jamestown, and that Moran had stated to him that they had "spent over $200,000 fight-

ing us at Jamestown." A letter from Moran to Gearhart of December 21, 1915, with reference to removal of the tent colony, was also introduced, and a statement of Moran that he represented White. Here some additional correspondence between the same parties was introduced, the most important of which was a letter of November 23, 1915, from Moran to Gearhart. The trial court considered this letter, setting it out in full in its opinion, which we do not deem necessary to do, the principal point of said letter being stated thus:

"President Dalrymple presented the Jimtown situation to the Board meeting yesterday. I was present and by unanimous vote Mr. Stokes' proposition they agreed to accept."

It appears from this letter that the question of the strike was submitted by President Dalrymple of District No. 21 to the board members of District No. 21, and not to the International Board, and corroborates the theory that the strike was a local one.

We refer to some new witnesses introduced by plaintiff in error and their testimony, viz.:

Fremont Stokes and G. O. Patterson, whose evidence relates to the question arising as to the employment of Attorney Patterson, an extraneous question to this controversy;

E. H. Fontaine and M. E. Anderson, whose testimony relates to the procuring of ground for the tent colony by the vice president of District 21, and photographs taken with relation thereto;

Rigo Valdenelli, who testified to being brought to Arkansas from Scranton, Pa., by plaintiff in error, to work in the mines, and the attempts of union men to intimidate him and others;

Carl Scholz, who testified as to general conferences between the Southwestern Coal Operators' Association and representatives of the several districts of the United Mine Workers within that jurisdiction, and as to conversations with Hanraty and Pete Stewart;

Lem Jones, who testified as to attempts by union men to stop him working at the Pennsylvania Company mines;

Pete Hanraty, whose evidence is the most important given by any of the new witnesses. He was also a new witness in the second trial of the Coronado Case. He was president of District No. 21 in 1915, and made speeches at the schoolhouses in the district, advocating the unionization of the mines, and was otherwise active in attempting to organize the miners at Jamestown. He wrote President White of the International Union under date of June 9, 1915:

"I wish you could see your way clear to send us some money, as I am afraid we are into a desperate fight with these two strong companies. Board members Ferns & Mooney are here. I left Robinson in Ft. Worth."

The record does not show that White responded to the call for money. He also wrote to White on June 14, 1915, concerning some publications in the Miners' Journal with reference to the Jamestown strike, and therein said:

"If you have any tents, I wish you would wire me upon receipt of this letter, as I will need about 200, and maybe more. We must win this strike at Jamestown, as they have been working non-union labor successfully for 5 years."

From Hanraty's evidence it appears that White wired he was shipping the tents and that he did in fact do so.

We have thus reviewed briefly all the evidence of any moment introduced in this trial that was not in the former one. In this connection we should consider the assignment of errors with reference to the refusal of the court to admit certain proffered evidence of witnesses Routh and McNamara, which was not in the former case, and the effect of such evidence had it been admitted.

Assignment of error No. 5, relates to the exclusion of the evidence of Dr. H. P. Routh. He had practiced medicine at Hartford, in the Prairie Creek country, in 1914; had heard a great deal of conversation between district board members as to the "effect of the threatened nonunion Bache-Denman operation." This evidence had nothing whatever to do with any action of the International or of its president, Mr. White, nor did it refer to affairs at Jamestown, the location of plaintiff in error's mines. The Supreme Court considered it in the last Coronado Case as bearing on the question of intent to interfere with interstate commerce. Clearly it did not bear on the question as to the International or White's connection with the alleged conspiracy.

Assignment of error No. 6 refers to the action of the trial court in excluding the evidence of James McNamara which had been taken by deposition. This evidence except in one particular related entirely to affairs at Prairie Creek and the Bache-Denman mines. It was considered by the Supreme Court in the second decision in the Coronado Case and several pages of the opinion are

devoted to it. Coronado Coal Co. et al. v. United Mines Workers of America et al., 268 U. S. 295, 301–304, inclusive, 45 S. Ct. 551, 69 L. Ed. 963. The testimony sought to be introduced relates to the trip McNamara made to Ft. Smith to see Stewart, president of District 21, and as to what Stewart told him that White, International President, had said to him concerning the plan to prevent Bache from producing coal. In this conversation White had said that, while he did not want the National organization to get mixed up in the matter, he wanted Stewart to go back to Hartford, which was one of the points where the Bache-Denman people were engaged in mining, and spread the news as to what the effect would be of the Bache nonunion-mined coal getting into the market, viz. the inability of the union operators to meet the Bache competition, and eventually the closing down of union-operated mines. McNamara also referred to a conversation with one Senator Covington in the presence of Stewart with reference to doing the same thing at Jamestown to the Pennsylvania Company mines as had been done at Prairie Creek to the Coronado mines, viz. destroy them. That is the single reference in the McNamara testimony to the Jamestown mines.

The Supreme Court in the Coronado Case said with reference to McNamara's testimony (268 U. S. 304, 45 S. Ct. 554 [69 L. Ed. 963]): "Giving the fullest credence to all that McNamara says, it is clear that White did not intend by what he did to make the Prairie Creek difficulty a national affair. The International Board had not approved as the constitution required that they should do in order to make it so. It is quite true that White himself personally can be held as a defendant, if McNamara's evidence is to be believed, for urging and abetting the destruction of the plaintiffs' property; but according to McNamara's testimony, repeated by him several times, White was particular to insist that he did not wish to be regarded as acting for the International in the matter or to involve it in the Prairie Creek difficulties." Unquestionably, if this testimony was insufficient in the Coronado Case to bind the International, it would have been insufficient if introduced in this case, as it did not refer at all to the Jamestown mines, outside of the statement of Covington. Therefore the rulings of the court rejecting the proffered evidence of Routh and McNamara are entirely unimportant in this hearing. Whether or not the evidence of Routh and McNamara was admissible as to District 21 is not before us.

Assignments of error 8 to 61 mainly refer to excluded articles from the Miners' Journal. While they do not set out the evidence excluded, and hence fail to conform to the rules of this court, we have examined them, and find the excluded extracts were merely cumulative. Certainly there were sufficient extracts introduced from the United Mine Workers' Journal to show the sympathy of the International with the union men in their attempts to organize the mines of the Pennsylvania and Coronado Companies and also to show its attitude as to the armed guard systems of these companies. However, these articles are not sufficient, in view of the Supreme Court decision in the Coronado Case, to show a ratification by the International Union of the disturbances and the strike. We cannot escape the conclusion that the present case as to the International is substantially, if not almost identically, the same as the former case, and that the rule of the "law of the case" should be applied.

However, if the case here presented could by virtue of the new evidence introduced be considered different from the former one, we would be compelled to hold that, under the law as laid down in the decisions in the Coronado Case, the evidence was not sufficient to warrant submitting the case to the jury as to the International. It was sought in the former hearing in this Court, as it is now sought, to differentiate the Coronado Case and this. It is suggested that the Coronado situation was merely a strike, and that here there was continual obstruction to plaintiff in error's securing and keeping labor through the years preceding the strike and up to the time of commencing this suit.

Counsel for plaintiff in error urge that the complaint does not allege a strike, but alleges bribery, libel, misrepresentation, violence, and intimidation on the part of the conspirators to disrupt plaintiff in error's working organization, and by slander and false statement to wreck its credit. The evidence abundantly shows that the principal disruption of plaintiff in error's labor force was caused by the strike in June, 1915. The greater part of the intimidation of men working at plaintiff in error's mines came from the tent colony, which was established at the time of the strike and was incidental thereto. Counsel argue that there were three definite periods of unionizing activities, the first beginning in 1910 and continuing to June,

1913, and that during that time there were secret and persistent efforts on the part of the union to obstruct the efforts of plaintiff in error to import labor from the outside states and work its mines as nonunion mines; that the second period running from July 1, 1913, to May 31, 1915, covered efforts on the part of plaintiff in error to ship men in to take the places of those whom defendants in error were taking away by various tactics, this being known as the Tom King campaign, and that as incident thereto National Organizer Britton joined Stewart and Adams in a trip to Scranton, where they attempted to injure plaintiff in error's credit; and that the third period, from June 1, 1915, to the time of bringing this suit, December 6, 1915, included the strike engineered by the International organizers, Ferns and Mooney, and the intimidations to the miners emanating from the tent colony.

■ Undoubtedly through the first and second periods referred to the International organizers, under the direction of the International, were doing all they could to unionize the mines of plaintiff in error, and plaintiff in error was doing all it could to prevent such unionization and to enforce its open shop policy. A great deal of foreign labor had been imported, which aroused much bitter feeling. Speeches were made at various places in the district, and more or less persuasion exerted to induce the men to join the union. These activities were carried on by campaigns, rather sporadic in their nature. The Tom King campaign for unionization commenced in June, 1913, and to use the language of a witness, "petered out" in a short time. King, though a National organizer, was hired and paid by the district. It is not claimed he committed any unlawful acts. His activities were along the lines of organizing. The district organization had tried to hold off the strike until August, 1915, but the feeling engendered over putting into effect the special law of the Arkansas Legislature excepting that part of Johnson county where plaintiff in error's mines were located from the general "mine-run law," resulting in material reduction in the amounts received by the miners for their services, was so intense that the miners themselves commenced the strike, and the district organization had little, if anything, to do therewith. Upon invitation of the men the district organization then took up the work of organizing the miners into the Union, which, of course, was not illegal. The trial court said on this subject:

"The undisputed testimony here is that the strike was begun in its inception by the miners who were working at the mine, and that it was not occasioned through the intervention of either District 21 or the International. The miners stopped work. There is testimony tending to show that advantage was taken of that by the officers of District 21 to organize the mine. Now, there was no illegality in going on a strike. There was no illegality in organizing the workers in that particular mine. The illegality, if any, consists in the illegal acts, if there were any illegal acts, which were directed toward the interference with the interstate commerce in preventing the mining of coal in that particular mine, with the intention of preventing its entering into interstate commerce." With this statement we agree.

■ If the International, through its organizers, had attempted in peaceful and lawful manner to induce men to join the union, if benefits were granted to the strikers, if it lent them tents, as the evidence shows it did, there would be nothing unlawful in these things. If there is one question that has been settled by the numerous decisions in the Coronado Case, it is that such a strike as took place here was a local one, and that the International was not responsible therefor under its constitution; that a ratification of or interference in such strike, to bind the International, must be in the manner provided by said constitution. As to the liability of the International, we think this case is not distinguishable from the Coronado Case.

If the intimidation to the labor forces of plaintiff in error during the strike and the activities of members of the tent colony which were incidental thereto are eliminated, it would be practically impossible under this record to determine within any reasonable bounds which men left the employ of plaintiff in error by reason of peaceful persuasion, working conditions, the tendency to migration of the labor employed, the constant friction between the American and alien labor, and those who left because of intimidation. From the evidence of plaintiff in error's witness Eyster, who was superintendent during a large part of the time of the alleged disturbances, it would appear there was little activity along the line of unionizing until the Tom King campaign in 1913, which continued but a short time, and then there was a period of comparative quiet up to the time of the strike, outside of the circulation of persistent rumors of raids.

The strike resulted from intense feeling aroused over the screening law, and undoubtedly on both sides, as is usual in such industrial warfare, unnecessary, unlawful, and in-

defensible acts were committed. The difficulties arising in the labor situation of plaintiff in error cannot, in our judgment, be divorced from the strike. It was the prime, moving, and principal cause thereof. In the Coronado Case there were attempts to unionize the Bache-Denman mines, resulting in the same kind of disturbances here complained of, and the Supreme Court in its decision in passing on the liability of the International dealt not alone with the strike, but also with the disturbances. The numerous decisions of the courts in the Coronado Case and in this case have settled the applicable law, and we are satisfied that whether the case as to the International is viewed as a new case or as one subject to the rule of the "law of the case," the court did not err in instructing a verdict in its favor.

We turn to the action of the court as to White: He was a defendant in the former suit, and in our opinion there we referred to his speeches, which were calculated to arouse the feelings and resentments of the miners. There is additional evidence introduced in the present case as to White, particularly the sending of the tents in response to Hanraty's appeal. There also is to be considered the proffered evidence of McNamara, which the court refused to admit. The Supreme Court said, in the second decision in the Coronado Case, that, if the McNamara evidence was to be believed, White could be held personally as a defendant for urging and abetting the the destruction of the "plaintiff's property." The property referred to was, of course, the property of the Coronado Company. It is not claimed that the McNamara evidence shows any statement whatever by White as to the property of the Pennsylvania Mining Company or as to its business, and, even if the McNamara evidence were admissible as to White, there was nothing in it to show his participation in the strike at Jamestown. In referring to the liability of White, counsel for plaintiff in error say in their arguments: "He sent the tents to help in the fight against the plaintiff in 1915. His creatures and subordinates, the International organizers and board members, implicated him in many important ways, and their official position and subordination to him is not challenged." He did send the tents for the tent colony, which was established at the time of the strike in June, 1915.

This in itself, however, is not adequate to show participation of the International in the alleged conspiracy or to bind him personally. The record shows that District 21 borrowed the tents from the International

and paid the expense of shipping the same. White was, of course, assisting in the work of unionizing the mines and had a right so to do; but we fail to find in the evidence anything to implicate him in any unlawful acts of the organizers in the attempted unionization, and we are satisfied that the evidence was not sufficient to hold him personally as implicated in any alleged conspiracy to unlawfully injure plaintiff in error. It is apparent from the views we have expressed that it is unnecessary for us to discuss the question as to restraint of interstate commerce.

We conclude the judgment of the trial court was correct, and it is affirmed.