UNITED LEATHER WORKERS INTERNATIONAL UNION, LOCAL LODGE OR UNION NO. 66, ET AL. v. HERKERT & MEISEL TRUNK COMPANY ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 233.  Argued April 24, 25, 1924.—Decided June 9, 1924.

1. A strike by employees, intended to prevent through illegal picketing and intimidation of workers the continued manufacture of goods by their employer and having that effect, is not a conspiracy to restrain interstate commerce, within the Anti-Trust Act, even though the strikers know that the products when made are to be shipped in interstate commerce to fill orders already received and accepted from the employer's customers in other States; provided there be no actual or attempted interference with the free transport of the products, when manufactured, from the factory to their destination in other States, or with their sale in those States. *United Mine Workers v. Coronado Co.*, 259 U. S. 344. P. 464.

2. The mere reduction of the supply of an article to be shipped in interstate commerce, by illegal and tortious prevention of its manufacture, is ordinarily an indirect and remote obstruction to that commerce; it is only when the intent or the necessary effect is to enable those preventing the manufacture to monopolize the supply, control prices, or discriminate as between would-be purchasers, that the unlawful interference can be said directly to burden interstate commerce. P. 471.

284 Fed. 446, reversed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a final decree of the District Court, granting an injunction in a suit by divers manufacturers of trunks and leather goods against striking employees and labor unions.

*Mr. John P. Leahy* for appellants.

*Mr. Charles A. Houts* and *Mr. Mat J. Holland,* with whom *Mr. Walter Gordon Merritt* was on the briefs, for appellees.

The formation of this conspiracy, and the acts done in pursuance thereof, were violative of the Anti-Trust Act, because a direct restraint was intended and placed upon the interstate business of the plaintiffs.

To accomplish this destruction the defendants had a choice of means available. They could have boycotted plaintiffs' goods in the hands of their customers. This would have been more difficult and less effective. Or they could have attempted to prevent the transfer companies from hauling plaintiffs' goods to the railroads for shipment. This they were probably not strong enough to do, and besides, such a course would have brought them into more certain conflict with the police. Or they could do, as they did do, assault and abuse those who desired to continue at work, and those who sought employment with plaintiffs, and thereby prevent plaintiffs' factories from operating. This latter was the easiest, safest and

most certain method of destroying plaintiffs' business. It was completely successful.

The evidence conclusively established the existence of the conspiracy to destroy plaintiffs' interstate business, and the unlawful means charged. Two courts have so found. See *Washington Securities Co.* v. *United States,* 234 U. S. 76.

Is a conspiracy to destroy an established interstate business, by preventing the manufacture of goods which are being sold and shipped in such interstate business, prohibited by the Sherman Act?

In *Eastern States Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, this Court said: " It [the Sherman Act] broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce."

The purpose of § 1 of the act was to prevent any direct and unreasonable interference with interstate commerce. It condemns any plan, scheme or device, adopted as a part of a combination or conspiracy which has that effect. *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *United States* v. *Reading Co.,* 226 U. S. 324.

The deduction to be made from these cases is that the Sherman Act will reach any act, however remote (standing alone) it may be from interstate commerce, if it is made an effective part of a combination to restrict such commerce.

The pertinency of these cases is made to appear when the reasoning of the appellants in this case is kept in mind. Their reasoning may be roughly stated thus:

The Sherman Act deals only with interstate commerce. Manufacture is not interstate commerce. Therefore, the Sherman Act is not concerned with the stoppage of manufacture. With equal propriety might the defendants in the *Northern Securities Co. Case* have reasoned: The

Sherman Act deals only with interstate commerce. The purchase of shares of stock of interstate railroads is not commerce. Therefore, the Sherman Act has no concern with such purchase.

The comprehensiveness of the Sherman Act is no longer a question. It forbids any means by which a combination or a conspiracy may seek to restrict interstate commerce. If stoppage of manufacture is resorted to as such a means, the act prohibits it. *Pennsylvania Sugar Refg. Co.* v. *American Sugar Refg. Co.*, 166 Fed. 254; *American Column Co.* v. *United States*, 257 U. S. 377; *Loewe* v. *Lawlor*, 208 U. S. 274; *United States* v. *Workingmen's Council*, 54 Fed. 994; *United States* v. *Elliott*, 62 Fed. 801; *Thomas* v. *Railway*, 62 Fed. 803; *United States* v. *Debs*, 64 Fed. 724.

In *Loewe* v. *Lawlor*, 208 U. S. 274, the boycott was directed at the manufacturers' goods after transportation had ended and the hats had lost their status as a part of interstate commerce. They were boycotted as a means of destroying the interstate business of the manufacturers. The means employed operated at one end, after transportation ceased. In this case they operated at the other end, before transportation commenced. The purpose in each case was identical.

See *Duplex Co.* v. *Deering*, 254 U. S. 443; *Stafford* v. *Wallace*, 258 U. S. 495; *United States* v. *Ferger*, 250 U. S. 199; *Lamar* v. *United States*, 260 Fed. 561; s. c. 250 U. S. 673.

The conspiracy in *United Mine Workers* v. *Coronado Co.*, 259 U. S. 344, was between the union coal operators and the International Union to restrain interstate commerce in coal and to monopolize it. As pointed out by Judge Sanborn, in the court below, the conspiracy alleged and proved in the present case is entirely different from that involved in the *Coronado Case*.

In *Hammer* v. *Dagenhart*, 247 U. S. 251, the restrictions placed on the manufacture of the goods had absolutely

no effect upon the goods themselves or upon the commerce into which they flowed, and the sole purpose of the act was to regulate the employment of children within the State.

In the present case the restraint imposed was not negligible; it was complete as to all commerce flowing from St. Louis in this particular line. It was not an indirect and incidental restraint on interstate commerce. The conspiracy charged was one to destroy this interstate business. The destruction of this business was the direct object of the conspiracy. Both the District Court and the Court of Appeals have so found. Such being its object, it cannot be said that the restraint was incidental. The stoppage of plaintiffs' interstate commerce by the means employed in this case was just as effectively a restraint upon interstate commerce, and just as violative of the Sherman Act, as would be the act of plaintiffs' competitors in Chicago, for instance, should they, for the purpose of destroying competition, purchase the stock of the plaintiff companies and by their control, thus secured, stop the manufacture of all goods in plaintiffs' factories.

Mr. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This suit was begun by a bill in equity filed in the District Court for the Eastern District of Missouri by the Herkert & Meisel Trunk Company and four others, all corporations of Missouri, engaged in making trunks and leather goods in St. Louis, against the United Leather Workers Union, Local Lodge or Union No. 66, an unincorporated association, its officers and agents and a number of its members. The bill averred that each of the complainants had built up a valuable business in making, selling and shipping in interstate commerce trunks and leather goods, that each received large quantities of raw material by interstate commerce, and employed a large

number of persons, men and girls, that on February 28, 1920, defendants demanded that their shops be unionized and conducted as closed shops and announced that if complainants refused they would ruin the interstate commerce business of each of them, that on April 10, 1920, the defendants, acting individually and on behalf of the defendant union, in order to destroy the complainants' business and to prevent their employees from continuing in their employment unless complainants would yield to their demands, began a strike, assaulted and threatened complainants' employees, and intimidated them so as to force them against their wills to quit complainants' employment, and that they thereby prevented complainants from engaging in and carrying on their interstate business and interfered with and obstructed them in the manufacture and shipment of the products of their factories sold to be shipped in interstate commerce. The bill charged that defendants were carrying out their illegal conspiracy and purposes by mass picketing and intimidation, that the interference with complainants' interstate commerce was intentional and malicious and was intended to destroy it, that it was in violation of the Anti-Trust Law and the Clayton Act, and that they had already inflicted, and unless restrained would continue to inflict, irreparable injury upon such business. The bill shows that each complainant's damage threatened exceeded three thousand dollars. The prayer was for a temporary and then a final injunction to prevent the intimidation, illegal picketing and other interference with complainants' manufacturing and interstate business and with their employees or would-be employees engaged in carrying it on. Certain of the defendants answered the bill and denied the picketing, intimidation, and violence and the purpose to interfere with complainants' interstate business as charged, and averred that they and the fellow members of the Union had lawfully quit the employment of complainants

because they could not agree upon the terms of a new agreement. The District Court upon preliminary hearing granted a temporary injunction and upon final hearing granted a final decree enjoining defendants as prayed. The case was taken on appeal to the Circuit Court of Appeals where the decree of the District Court was affirmed, one Judge dissenting. 284 Fed. 446. The cause now comes before us on appeal under § 241, Judicial Code.

The evidence adduced before the District Court showed that the defendant, the Local Union No. 66 of the United Leather Workers, having declared a strike against the complainants and withdrawn its members from their employ, instituted an illegal picketing campaign of intimidation against their employees who were willing to remain and against others willing to take the places of the striking employees, that the effect of this campaign was to prevent the complainants from continuing to manufacture their goods needed to fill the orders they had received from regular customers and would-be purchasers in other States, that such orders covered ninety per cent. of all goods manufactured by complainants, that the character of their business was known to the defendants, and that the illegal strike campaign of defendants thus interfered with and obstructed complainants' interstate commerce business to their great loss. There was no evidence whatever to show that complainants were obstructed by the strike or the strikers in shipping to other States the products they had ready to ship or in their receipt of materials from other States needed to make their goods. While the bill averred that defendants had instituted a boycott against complainants and were prosecuting the same by illegal methods, there was no evidence whatever that any attempt was made to boycott the sale of the complainants' products in other States or anywhere or to interfere with their interstate shipments of goods ready to ship.

The sole question here is whether a strike against manufacturers by their employees, intended by the strikers to prevent, through illegal picketing and intimidation, continued manufacture, and having such effect, was a conspiracy to restrain interstate commerce under the Anti-Trust Act because such products when made were, to the knowledge of the strikers, to be shipped in interstate commerce to fill orders given and accepted by would-be purchasers in other States, in the absence of evidence that the strikers interfered or attempted to interfere with the free transport and delivery of the products when manufactured from the factories to their destination in other States, or with their sale in those States.

We think that this question has already been answered in the negative by this Court. In *United Mine Workers* v. *Coronado Co.*, 259 U. S. 344, a coal mining company in Arkansas changed its arrangement with its employees from a closed shop to an open shop. The local union resented the change and the avowed purpose of the company to protect non-union employees by armed guards. Violence, murder and arson were resorted to by the union. Seventy-five per cent. of the output of the mine was to be shipped out of the State and a car of coal prepared for interstate shipment was destroyed by the mob of strikers and their sympathizers. It was contended that, as the result of the conspiracy was to reduce the interstate shipment of coal from the mines by 5,000 tons or more a week, this conspiracy was directed against interstate commerce, and triple damages for the injury inflicted could be recovered under the Federal Anti-Trust Law. But this Court held otherwise and reversed a judgment for a large amount on the ground that the evidence did not disclose a conspiracy against interstate commerce, justifying recovery under the law. The language of the Court was (p. 407):

" Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such. In *Hammer* v. *Dagenhart,* 247 U. S. 251, 272, we said: ' The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce, make their production a part thereof. *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439.' Obstruction to coal mining is not a direct obstruction to interstate commerce in coal, although. it, of course, may affect it by reducing the amount of coal to be carried in that commerce." The same rule was followed in *Gable* v. *Vonnegut Machinery Co.,* 274 Fed. 66, 73, 74.

The same general principles are affirmed in *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 259; *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129, 136; *Arkadelphia Milling Co.* v. *St. Louis S. W. Ry. Co.,* 249 U. S. 134, 151; *McCluskey* v. *Marysville Ry. Co.,* 243 U. S. 36, 38; *Diamond Glue Co.* v. *U. S. Glue Co.,* 187 U. S. 611, 616; *Capital City Dairy Co.* v. *Ohio,* 183 U. S. 238, 245; *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 12, 13; *Kidd* v. *Pearson,* 128 U. S. 1, 20, 21; *Coe* v. *Errol,* 116 U. S. 517, 528.

The Circuit Court of Appeals seems first to have based its conclusion on cases like *Rearick* v. *Pennsylvania,* 203 U. S. 507; *Caldwell* v. *North Carolina,* 187 U. S. 622; *Brennan* v. *Titusville,* 153 U. S. 289; and *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, 497. These dealt directly with the sale of goods in interstate commerce. They were cases of state taxation upon the solicitation and acceptance of orders of goods to be sent from one State to another. The subject matter taxed was contracts of sale proposed or made for deliveries of goods in interstate commerce. It is a far cry from such cases to a strike to induce the employers to make better terms with their employees when no interference with the transportation or

future sale of the goods by the strikers is attempted or shown.

The Circuit Court of Appeals found further justification for its conclusion in cases like *Eureka Pipe Line Co.* v. *Hallanan,* 257 U. S. 265, *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277, *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, and *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50. They present the practical conception of interstate commerce elaborated in *Swift & Co.* v. *United States,* 196 U. S. 375, hereafter to be discussed, as a flowing stream created by a course of business to be protected against State invasion, but it must be a real and direct invasion and not something incidental or remote. Thus in the *Pipe Line Company* and *Gas Company Cases,* the State of West Virginia sought to tax a stream of oil and gas flowing constantly through the State and out of it. It was held that the mere power of those who directed the stream to divert it from interstate commerce when as a course of business it was constantly interstate with only incidental and minor diversions to intrastate commerce, did not expose to the taxing power of the State that part of the flow which crossed state lines. The burden and invasion of interstate commerce was direct. In the *Bondurant Case,* a Tennessee Milling Company bought a crop of grain in Kentucky, to be delivered on board the cars in Kentucky for shipment to Tennessee in accord with a course of business between the parties. It was held that an effort by the State of Kentucky to require a license of the Tennessee Company before it could buy and ship grain from Kentucky to Tennessee was a burden on, and invasion of, interstate commerce even though the Milling Company might have stopped the grain in Kentucky contrary to the usual course.

In *Lemke* v. *Farmers Grain Co.,* a state law of North Dakota subjected the purchase price of all grain flowing in a regular course of business from that State to the

market in Minneapolis, Minnesota, to a North Dakota inspector who was required to fix the price and determine thereby the profit the buyer should make after paying the freight to Minneapolis at the market price in that city. This was held to be a direct burden and restraint upon the interstate commerce in the grain from one State to the other. It was a direct limitation on that commerce.

None of these cases, although they all illustrate the practical conception of interstate commerce as a flowing stream from one State to another formed by a regular course of business, can properly be said to support the argument that mere intentional cutting down of manufacture or production is a direct restraint of commerce in the product intended to be shipped when ready, or to be any departure from the general rule last announced in the *Coronado Case* and uniformly applied in all the cases referred to above, which it followed. The effect upon interstate commerce in the four cases just cited on the other hand was directly burdensome and restraining.

Then the Circuit Court of Appeals found sustaining precedent in *Swift & Co.* v. *United States,* 196 U. S. 375. In nat case the defendants were charged with a conspiracy to monopolize interstate commerce in cattle, step by step from the purchase of them on the western plains, in the transportation of them by the railroads through to the stockyards at Chicago, their sale and distribution there, their slaughter and preparation as meats in the packing houses of that city and their distribution and sale in the East. This Court held that such a conspiracy was a violation of the Federal Anti-Trust Law because it was an intended obstruction to the flow of interstate commerce which Congress in the Anti-Trust Law intended to keep free and untrammeled. It held that the intent to monopolize and restrain the stream of interstate commerce

and the probability that by such methods and steps as were attempted the purpose of the conspiracy could be effected, brought the whole machinery of the conspiracy within the federal jurisdiction. The case rested wholly on the probably effective intent of the conspirators directed against interstate commerce.

The case of the *Addyston Pipe Co.* v. *United States,* 175 U. S. 211, was an agreement between those who made and sold iron pipe in different States to fix prices as between themselves and not sell and deliver pipe from their foundries across state lines in competition with each other. Their intent and ability to control prices and prevent the public from having the benefit of competition in interstate trade brought them within the Federal Anti-Trust Act.

So in the case of *Montague & Co.* v. *Lowry,* 193 U. S. 38, manufacturers in eastern States of tiles and grates agreed with manufacturers and dealers in California not to sell tiles and grates to local dealers who would not agree to keep up prices. The intent to control commerce between the eastern States and local dealers in California, and thus to maintain prices, was held to constitute a conspiracy in restraint of interstate commerce.

On the other hand, *Hopkins* v. *United States,* 171 U. S. 578, *Anderson* v. *United States,* 171 U. S. 604, and *United States* v. *E. C. Knight Co.,* 156 U. S. 1, were held not to come within the Federal Anti-Trust Law because the facts of those cases were not thought to reveal the probably effective intent directly to compass the restraint on interstate commerce.

The *Knight Case* has been looked upon by many as qualified by subsequent decisions of this Court. The case is to be sustained only by the view that there was no proof of steps to be taken with intent to monopolize or restrain interstate commerce in sugar, but only proof of the acquisition of stock in sugar manufacturing companies to

control its making. As intimated in the *Swift Case* (196 U. S. 397), the *Knight Case* was very near the line. See also the distinction pointed out by the Circuit Court of Appeals in *Pennsylvania Sugar Refg. Co.* v. *American Sugar Refg. Co.,* 166 Fed. 254, 256, between that case and the *Knight Case.* The *Knight Case* emphasizes the difference between manufacture and interstate commerce. But the *Knight Case* was a far stronger case for federal jurisdiction under the Anti-Trust Law, because of the probable relation between the monopoly of manufacture and sale in interstate commerce, than the case at bar, in which there is present no element of intended and probable monopoly or discrimination in interstate commerce. The same element was lacking in the *Coronado Case.*

In *Loewe* v. *Lawlor,* 208 U. S. 274, and in *Duplex Co.* v. *Deering,* 254 U. S. 443, members of labor unions having a controversy with their employers sought to embarrass the sales by their employers of the product of their manufacture in other States by boycott and otherwise. They were held guilty of a conspiracy against interstate commerce because of their palpable intent to achieve their purpose by direct obstruction of that commerce.

The cases of *Stafford* v. *Wallace,* 258 U. S. 495, and *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, are also supposed in some way to sustain the view that a strike against the manufacture of commodities intended to be shipped in interstate commerce is a conspiracy against that commerce. What those cases decided was that when Congress found from investigation that more or less constant abusive practices and a course of business, usually only within state police cognizance, threatened to obstruct or unduly to burden the freedom of interstate commerce, it could by law institute supervision of such course of business in order to prevent the abuses having such effect. As said in *Stafford* v. *Wallace* (p. 520):

" The reasonable fear by Congress that such acts, usually lawful and affecting only intrastate commerce when considered alone, will probably and more or less constantly be used in conspiracies against interstate commerce or constitute a direct and undue burden on it, expressed in this remedial legislation, serves the same purpose as the intent charged in the Swift indictment to bring acts of a similar character into the current of interstate commerce for federal restraint."

In *United States* v. *Patten,* 226 U. S. 525, 543, running a corner in the available supply of a staple commodity, normally the subject of interstate commerce, in order to enhance its price artificially in the whole country, although the corner was carried on only in New York by sale of cotton futures, was held to be a monopoly of interstate commerce in violation of the Federal Anti-Trust Act. It was the intent to monopolize such commerce and its probability of success which sustained the indictment.

In the *Coronado Case, supra,* (p. 410), this Court referred to the *Patten Case* and the difference between that and the *Coronado Case* as follows:

" The difference between the *Patten Case* and that of *Ware & Leland* v. *Mobile County,* 209 U. S. 405, illustrates a distinction to be drawn in cases which do not involve interstate commerce intrinsically but which may or may not be regarded as affecting interstate commerce so directly as to be within the federal regulatory power. In the *Ware & Leland Case,* the question was whether a State could tax the business of a broker dealing in contracts for the future delivery of cotton where there was no obligation to ship from one State to another. The tax was sustained and dealing in cotton futures was held not to be interstate commerce, and yet thereafter such dealings in cotton futures as were alleged in the *Patten Case* where they were part of a conspiracy to bring the entire cotton trade within its influence, were held to be in restraint of

interstate commerce.  And so in the case at bar, coal mining is not interstate commerce and obstruction of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint of that commerce unless the obstruction to mining is intended to restrain commerce in it or has necessarily such a direct, material and substantial effect to restrain it that the intent reasonably must be inferred."

This review of the cases makes it clear that the mere reduction in the supply of an article to be shipped in interstate commerce, by the illegal or tortious prevention of its manufacture, is ordinarily an indirect and remote obstruction to that commerce.  It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize the supply, control its price or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce.

The record is entirely without evidence or circumstances to show that the defendants in their conspiracy to deprive the complainants of their workers were thus directing their scheme against interstate commerce.  It is true that they were, in this labor controversy, hoping that the loss of business in selling goods would furnish a motive to the complainants to yield to demands in respect to the terms of employment; but they did nothing which in any way directly interfered with the interstate transportation or sales of the complainants' product.

We concur with the dissenting Judge in the Circuit Court of Appeals when, in speaking of the conclusion of the majority, he said: "The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to federal jurisdiction provided any appreciable amount of its product enters into interstate commerce." (284 Fed. 446, 464.)

We can not think that Congress intended any such result in the enactment of the Anti-Trust Act or that the decisions of this Court warrant such construction.

*Decree reversed.*

MR. JUSTICE McKENNA, MR. JUSTICE VAN DEVANTER, and MR. JUSTICE BUTLER, dissent.