## PITTSBURGH TERMINAL COAL CORPORATION v. UNITED MINE WORKERS OF AMERICA et al.

District Court, W. D. Pennsylvania. September 30, 1927.

No. 19.

1. **Courts** ⊜299(1)—Whether federal question is presented in suit to enjoin restraint of interstate commerce must be determined from face of bill (Sherman Anti-Trust Act [15 USCA §§ 1–7, 15]; Clayton Act [38 Stat. 730]).

In determining jurisdiction of federal court in suit under Sherman Anti-Trust Act (15 USCA §§ 1–7, 15), and Clayton Act (38 Stat. 730), to enjoin acts in restraint of interstate commerce, question whether federal question is presented must be determined from face of bill.

**2. Courts ⬅═299(3)—To present "federal question," facts averred must show clearly and distinctly that suit arises under some federal law.**

To present federal question and confer jurisdiction on federal court, averments of pleading must be positive, and appear, not by inference, but by distinct averments, since essential facts averred must show clearly and distinctly that suit arises under some federal law.

[Ed. Note.—For other definitions, See Words and Phrases, First and Second Series, Federal Question.]

**3. Courts ⬅═299(3)—Bill against mine workers' union to enjoin interference with workers and occupancy of plaintiff's houses held to state cause of action within Sherman Act; "federal question" (Sherman Anti-Trust Act [15 USCA §§ 1–7, 15]).**

Bill by coal corporation against mine workers' union to enjoin combination and conspiracy to commit, and committing of, acts in restraint of interstate commerce, alleging interference with nonunion workers and occupancy of plaintiff's houses by striking members of defendant as part of plan to keep nonunion coal out of interstate market, *held* to present federal question, by stating cause of action within purview of Sherman Anti-Trust Act (15 USCA §§ 1–7, 15).

**4. Commerce ⬅═57—Obstruction of coal mining is not "restraint of interstate commerce," in absence of intent, actual or inferred, to restrain it.**

Coal mining is not interstate commerce, and obstruction of coal mining is not restraint of that commerce, unless obstruction is intended to restrain such commerce, or has necessarily such a direct, material, and substantial effect to restrain it that intent reasonably must be inferred.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraint of Commerce.]

In Equity. Suit by the Pittsburgh Terminal Coal Corporation against the United Mine Workers of America and others. Defendants' motion to dismiss the bill overruled, and plaintiff's motion for preliminary injunction granted.

Stanley & Horwitz, J. E. Mathews, and C. F. Taplian, all of Cleveland, Ohio, for plaintiff.

O. K. Eaton and Wm. H. Coleman, both of Pittsburgh, Pa., for defendants.

SCHOONMAKER, District Judge. This is an action in equity, brought under the provisions of the Sherman Anti-Trust Act (chapter 647, 26 Stat. 209 [15 USCA §§ 1–7, 15]) and the Clayton Act (38 Stat. 730), by the Pittsburgh Terminal Coal Company, owner and operator of coal mines in the Pittsburgh district of Pennsylvania,

against the United Mine Workers of America, a voluntary association of coal mine workers, its district and local unions in the Pittsburgh district, some of its international, district, and local officers, as well as certain of its individual members, and the National Surety Company, a bonding corporation, in which the plaintiff seeks to enjoin the defendants from combining and conspiring to commit, and from committing, various acts in restraint of interstate commerce.

The case is now before the court on two motions: (1) Defendants' motion to dismiss the bill of complaint for want of jurisdiction; (2) plaintiff's motion for a preliminary injunction. We shall consider and dispose of the defendants' motion first, for, unless we have jurisdiction, there is no need to proceed further.

[1–3] Whether a federal question is presented or not must be determined from the face of the bill. We note, first, that there is no diversity of citizenship alleged, and that therefore jurisdiction can be maintained only if there be averments of fact in the bill which clearly show violations of the Anti-Trust Act. The defendants contend that the bill lacks these necessary averments; that, while the bill does aver that the defendants are engaged in a conspiracy directed against the movement of coal in interstate commerce, there are no facts averred which show that the defendants are operating so as to prevent shipments of coal in interstate commerce, nor to exclude it from the interstate markets; that the statement of the existence of the conspiracy is therefore a mere conclusion of law, unsupported by any facts on which to base such a conclusion.

The test to be applied to a plaintiff's statement of his cause of action, in order to determine whether a federal question is involved, is stated by the Supreme Court in St. Joseph & Grand Island Railroad Co. v. R. M. Steele, 167 U. S. 659, 17 S. Ct. 925, 42 L. Ed. 315, as follows:

"Not every mere allegation of the existence of a federal question in a controversy will suffice for that purpose. There must be a real substantive question, on which the case may be made to turn. Nor can jurisdiction be inferred argumentatively from the averments in the pleadings, but the averments should be positive. Hanford v. Davies, 163 U. S. 273, 279 [16 S. Ct. 1051, 41 L. Ed. 157]."

And again in Hull v. Burr, 234 U. S. 712, at page 720, 34 S. Ct. 892, 895 (58 L. Ed. 1557),

"And this must appear, not by mere inference, but by distinct averments according to the rules of good pleading; not that matters of law must be pleaded as such, but that the essential facts averred must show, not as a matter of mere inference or argument, but clearly and distinctly, that the suit arises under some federal law."

Now, applying this test to the case at bar, we are of the opinion that the bill of complaint clearly states a cause of action within the purview of the Sherman Act. A brief summary of the allegations contained in the bill of complaint follows:

That the plaintiff is the owner of, and engaged in operating, seven bituminous coal mines located within the general industrial district of Pittsburgh; that the average output of coal from these mines under normal conditions is approximately 17,000 tons daily of which 83 per cent. is habitually and regularly shipped in interstate commerce to consignees in various states of the Union and the Dominion of Canada, the plaintiff having at the time of the institution of this suit valid and subsisting contracts for the furnishing of large quantities of coal in interstate commerce; and that all these facts were well known to the defendants.

That the United Mine Workers of America is a voluntary association of persons composed of workmen identified with the mining industry, its total membership being about 550,000; that its field of operations is coextensive with the principal coal-mining operations of the United States, especially in the states of Pennsylvania, West Virginia, Ohio, Kentucky, Indiana, Illinois, Arkansas, and Oklahoma; that the defendant District No. 5, United Mine Workers of America, is a voluntary association composed of members and local unions of the United Mine Workers of America in western Pennsylvania, embracing the Pittsburgh district; and that the defendants the local unions named are voluntary associations chartered as units of the United Mine Workers of America, and composed exclusively of members of the association; that the individual defendants are respectively officers of the defendants' national body or of its district and local unions, or individual members of the organization; that the defendant the National Surety Company is a corporation having its principal place of business in the city of New York, with branch offices and agencies in Pittsburgh, that represent it in its transactions.

That the United Mine Workers of America, its officers, international executive com-

22 F.(2d)—36

mittee, and members generally, have for a number of years been engaged in the continuing conspiracy to prevent the operation of nonunion coal mines within or near the competitive field composed of western Pennsylvania, Ohio, Indiana, and Illinois; that during this period the said national body, its district and local unions, its officers, committees, and members, have planned by the use of organized methods, supplemented and reinforced in many cases by acts of intimidation, coercion, violence, and even by armed defiance of civil authorities, to compel mine operators to deal exclusively with the national body on a closed union shop basis, to pay a higher scale of wages, and to submit to more burdensome working conditions than those prevailing in the nonunion mines, and all this with the end in view to obtain a monopolistic control over the coal-mining output on the American continent. That, for the further accomplishment of this monopolistic control, the defendants have been engaged, and are engaged in the widespread continuing conspiracy to destroy nonunion coal-mining operations; to restrict the production of coal from such mines and the shipment of such coal in interstate commerce; to fix and regulate the cost of production of coal, and thereby to control the price of coal moving in interstate commerce to all consumers of coal as a fuel; to expend large sums of money in procuring strikes against nonunion mines; to incite, encourage, and reward breaches of relationship of employment at such mines; to destroy the competition of all such nonunion coal and to exclude it from the markets of the United States and Canada, thereby leaving the markets open exclusively to the union product; to preserve and increase the rates of wages in all unionized mines, and to prevent any reduction thereof, by harassing, obstructing, and preventing the movement of nonunion coal to the said markets in interstate commerce; to prevent, by picketing, the securing of any workmen with which to operate the mines; to coerce, by all the means set forth in the bill, nonunion operators to enter into closed shop agreements containing the union wage scale, with the check-off provision, whereby the mine owners will be compelled to deduct union dues of their miners; and containing also provisions for the monopolistic exclusion of all nonunion miners, which contracts are to be extorted from operators, irrespective of their ability to operate their mines successfully thereunder.

It is further alleged that the union de-

fendants, pursuing one branch of said general conspiracy, on or prior to March 15, 1927, agreed among themselves to obstruct and prevent, by concerted action, the production of coal by the Pittsburgh Coal Company, a mining corporation located in the Pittsburgh district, with the intent to prevent the shipment of said coal in interstate commerce, because it was produced from mines that were being operated as "open" shops, thus seeking to compel said company to employ as miners only members of the defendant National Union, and to pay such miners the union coal wages; said Pittsburgh Coal Company operating about 75 mines, with a normal output of 12,000,000 tons yearly, of which about 70 per cent. is regularly shipped in interstate commerce. That thereupon the Union defendants, in pursuance of said conspiracy, demanded compliance on the part of the Pittsburgh Coal Company, and, upon its refusal to comply with the union demands, organized and put into effect a campaign of violence, lawlessness, interference, and slander, directed against said company and all its employees, accompanied by assaults, bombing and dynamiting of employees' houses, insult and abuse of the company's employees, and slanderous attacks in the labor market, all with the intent in view to curtail or completely prevent the output of said mines being shipped in interstate commerce. It is further alleged that on or about the 15th of April, 1927, in carrying out this general conspiracy, the defendants applied their campaign and system of attack to all other companies in the Pittsburgh district (with a normal annual capacity of 40,000,000 tons, of which 70 per cent. is interstate commerce), and that among the operators subjected to this attack is the present plaintiff.

The plaintiff alleges that on or about the 1st day of April, 1927, the union defendants entered into a conspiracy especially directed against the plaintiff, which was a part of the larger general conspiracy as above described, the purpose and design of which was to obstruct and hinder the plaintiff from producing coal and shipping the same in interstate commerce, and to prevent and restrain such production and shipment, and as a part of said scheme it was agreed that the plaintiff's employees should simultaneously quit the plaintiff's employment, that effective measures should be taken to terrorize, assault, follow up, and otherwise forcibly interfere with all new employees whom the plaintiff might procure; that members of the defendant union should remain in plaintiff's houses in violation of their contracts to surrender possession, thus depriving the plaintiff of a place to house its employees and disabling it from fully and efficiently operating its mines; that all men venturing to accept work with the plaintiff should be exposed to riotous attack, insult, espionage, and every possible type of interference, outrage, and threat; that like methods were to be used against persons acting as chauffeurs, teamsters, delivery men, or others carrying out the needs of the plaintiff in attempting to operate its mines.

The plaintiff further alleges that it was the integral part of said scheme that the plaintiff should be required and compelled to cease production of its coal, except upon compliance with the terms imposed by the union defendants, which terms were, in fact, impossible of performance; that this action on the part of the defendant was in aid of all unionized mines in all the other states of the central competitive field, and was intended by the defendants so to be; and that like design and purpose was entertained by the defendants with respect to all other mines in said bituminous field, who were not to be allowed to ship their coal in interstate commerce, except upon terms imposed by the defendants.

In the execution of this alleged conspiracy, the plaintiff charges that prior to the 1st day of April, 1927, no controversy of any character existed between the plaintiff and its 3,000 employees; that these employees, on the 2d day of April, 1927, remained away from work, which result accrued solely from the acts and policies of the union bodies, the defendants in this action; that there was no separate negotiation between the plaintiff and its employees at that period; that there was a like withdrawal of all other members of the defendant union in the national bituminous field coincident with the withdrawal of the plaintiff's employees in point of time, and was in response to orders issued from the controlling body and officers of the United Mine Workers of America; that the conduct and direction of the suspension or strike was taken over by the national body and its officers, and that it is still under their control; that the defendant Murray was formally authorized by the international executive committee to take permanent charge of the entire operations in western Pennsylvania; and that official proclamation was made that the conduct of the strike was under the direction of the national body.

That on or about the 7th day of April, 1927, the plaintiff undertook by legal action in the courts of Pennsylvania to regain possession of the houses leased to miners during their term of employment by the company and to secure therein judgments of repossession; that the defendants, United Mine Workers of America, caused an appeal to be entered in the Superior Court of Pennsylvania from these judgments of repossession, the United Mine Workers of America furnishing, through the National Surety Company, the necessary bonds of appeal, using the funds of the national association in the prolongation of the appeals; that this action on the part of the national body was officially proclaimed in its official publication, the "Mine Workers' Journal," to have been directed by the national body, the lessees of the company houses being thereby directed and encouraged to continue the policy of obstruction.

The plaintiff further alleges that the union defendants undertook to prevent the reopening of the mines and the hiring of workmen, and maintained for that purpose official pickets wearing badges; that a large number of persons, acting for and with them, including the wives of miners, lined the roadways and streets leading to the mines, and subjected plaintiff's employees in the mines, and persons seeking employment therein, to insults, heckling, and annoyance; that in many cases, where workmen were being transported to the mines, they were dragged from the cars by riotous mobs and made to promise to go away and stay away from the plaintiff's mines; that chauffeurs were continually threatened, and the taxicabs were so harassed that they refused to accept further orders for the delivery of workmen; that union workmen, aided and abetted by the lawless elements which they enlisted to stand with them, threw stones at the plaintiff's employees and assaulted them, pulling them from trucks transporting them to the mines; that assaults, threats, intimidation, and abuse were constantly directed toward any employee of the plaintiff who was not directly under the protection of an adequate number of police officers; that the plaintiff has, since the 2d of April, 1927, hired all its employees under a contract of employment, which fact was known to the defendants, yet they, notwithstanding that fact, have persisted in the policy of aggression, lawlessness, and violence directed against the plaintiff, with the intent to coerce the plaintiff and its employees to commit breaches of said contract of employment.

The plaintiff alleges that, as a direct and natural result of the conspiracy thus entered into and put in execution by them, the operation of the plaintiff's mines was wholly discontinued on or about April 1, 1927, except such subsequent partial efforts at operation as the plaintiff could make, hindered by the interference of defendants, as outlined in the bill, and that as a consequence of such discontinuance the plaintiff has lost large and substantial sums each month; that this loss is now continuing, the direct property damage, consisting of injuries to houses, plant, machinery, and equipment, to the amount of at least $100,000; that the plaintiff has been put to much additional expense for mine guards, and is put to continual expense for additional houses and barracks not normally needed for miners, to the amount of at least $135,000.

From these allegations of the bill the defendants adduce that only the actual facts alleged are that the defendants have interfered with the local operation of the coal mines, and that such interference, admitting it all to be true, is not an interference with interstate commerce, because there are no allegations in the bill which show that the defendants have in any manner interfered with the shipment of coal in transit, or after arrival at its destination in any other state. They argue, relying upon the opinion of the Supreme Court in the case of United Mine Workers of America v. Coronado, 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, that coal mining is not interstate commerce, and that the interference with the purely local operations of coal mining is not interference with interstate commerce. This ruling of the Supreme Court was again approved in the case of United Leather Workers v. Herkert, 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; the court holding that interference with the manufacture of trunks and leather goods was not of itself an interference with interstate commerce, even though its effect might be to curtail the shipment of the manufactured product in interstate commerce.

Because of the averments in the bill of the existence of a general conspiracy and intent on the part of the defendants to interfere with the production of coal in all nonunion mines in the central competitive field, composed of western Pennsylvania, Ohio, Indiana, and Illinois, coupled with the allegation of the intent thereby to keep nonunion coal out of the interstate market, in order that the coal output of unionized mines should have a monopoly of the interstate coal

markets, and the allegation of the special and particular conspiracy to keep from the interstate market coal produced at all nonunion mines in the Pittsburgh district, and particularly of the coal mines of the plaintiff in this action, all this with the intent to interfere with and prevent the interstate commerce in coal produced at nonunion mines in the Pittsburgh district, we cannot agree that the facts alleged in the bill show merely an interference · with local mining of coal. These allegations are clearly sufficient to set forth the character and nature of the conspiracy and the intent and purpose for which it was entered into.

The Supreme Court, dealing with allegations in a bill of complaint of this sort, and considering the objections thereto because it did not set forth sufficient, definite, or specific facts to give jurisdiction, said in the case of Swift v. United States, 196 U. S. 375, 395, 25 S. Ct. 276, 279 (49 L. Ed. 518) :

"The general objection is urged that the bill does not set forth sufficient definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous and shifting, even the constituent parts alleged are, and from their nature must be, so extensive in time and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties."

Now, in the present case, the general scheme, we think, is properly and adequately set out, namely: It is a conspiracy to interfere with the interstate marketing of coal produced in nonunion mines by the means of strikes, force, and intimidation at the point of production, and that this is all undertaken with the intent and purpose to prevent coal mined at nonunion mines from finding its way into interstate commerce; but were there no averments in the bill of the intention to interfere with interstate commerce, yet such an intention might be inferred as the necessary and direct result of the preventing of such an enormous quantity of coal from going into interstate commerce through the stoppage of such production.

[4] In the case of United Mine Workers v.

Coronado Co., 259 U. S. 344, 410, 42 S. Ct. 570, 583 (66 L. Ed. 975, 27 A. L. R. 762), the Supreme Court, speaking through Mr. Chief Justice Taft, has laid down the rule with reference to coal mining and its bearing upon interstate commerce as follows:

"And so, in the case at bar, coal mining is not interstate commerce and obstruction of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint of that commerce, unless the obstruction to mining is intended to restrain commerce in it or has necessarily such a direct, material and substantial effect to restrain it that the intent reasonably must be inferred."

Applying this statement of the law to the facts alleged in the statement of claim, there is no doubt that there is a clear allegation in the present case that the obstruction offered by the defendants to the mining of coal by the plaintiff is intended for the purpose of restraining interstate commerce, and that such obstruction also necessarily has such a direct, material, and substantial effect upon interstate commerce that, even in the absence of averments of intent, such intent must be reasonably inferred.

The second Coronado Case, Coronado v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963, is well illustrative of cases in which the court will act to restrain the interference with the production and mining of coal, where the purpose and intent thereof is to hinder and impede interstate commerce. In the first opinion, the Supreme Court held that the mere elimination from interstate commerce of 5,000 tons of coal a week was not such a tonnage that its withdrawal from interstate trade would furnish a basis of itself for inferring a restraint of interstate trade; but when the case came to the court again, and it appeared that the tonnage capacity of the mines in question was 5,000 tons a day rather than 5,000 tons a week, the Supreme Court said that the evidence of this tonnage capacity, together with other relevant elements in the case as to the intent of the Union to prevent shipments into neighboring states, was sufficient on which to take the case to the jury in an action for violation of the Anti-Trust Act; Mr. Chief Justice Taft, delivering the opinion of the court, saying:

"The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlaw-

fully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act. United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 408, 409, 42 S. Ct. 570, 66 L. Ed. 975, 994, 995, 27 A. L. R. 762; United Leather Workers' International Union v. Herkert & M. Trunk Co., 265 U. S. 457, 471, 44 S. Ct. 623, 68 L. Ed. 1104, 1109, 33 A. L. R. 566; Industrial Ass'n v. U. S., 268 U. S. 64, 45 S. Ct. 403, 69 L. Ed. 849, decided April 13, 1925. We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of nonunion coal and prevent its shipment to markets of other states than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines."

The principle announced in this second Coronado Case they again affirmed in the late case of United States v. Brims, 272 U. S. 549, 47 S. Ct. 169, 71 L. Ed. 403, and again in the later case, decided April 11, 1927, of Bedford Cut Stone Company v. Stone Cutters' Ass'n of North America, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916.

In the case of International Organization, United Mine Workers of America, v. Red Jacket C. C. & C. Co., and 11 other cases, 18 F.(2d) 839, the Circuit Court of Appeals of the Fourth Circuit, having before them facts similar to the facts recited in the bill of complaint in this case, held that the United States courts clearly had jurisdiction to restrain the interference of the United Mine Workers of America with the operation of coal mines, and held further that the interference with the production of the mines in question, as contemplated by the United Mine Workers of America, would necessarily interfere with interstate commerce in coal to a substantial degree. There the production of the coal involved was about the same as that involved in the Pittsburgh district, about 40,000,000 tons a year. Judge Parker, applying the facts of the Red Jacket Case to the rule laid down in the second Coronado decision, states:

"We think there can be no question that the case at bar falls within the rule just quoted from the second Coronado decision. Here it appears that the total production of the mines of complainants is in excess of 40,000,000 tons per year, more than 90 per cent. of which is shipped in interstate commerce. Interference with the production of these mines as contemplated by defendants would necessarily interfere with interstate commerce in coal to a substantial degree. Moreover, it is perfectly clear that the purpose of defendants in interfering with production was to stop the shipments in interstate commerce. It was only as the coal entered into interstate commerce that it became a factor in the price and affected defendants in their wage negotiations with the union operators. And, in time of strike, it was only as it moved in interstate commerce that it relieved the coal scarcity and interfered with the strike. A conspiracy is in violation of the statute, where there exists an intent to restrain interstate trade and commerce, and a scheme appropriate for that purpose, even though it does not act directly upon the instrumentalities of commerce. Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; U. S. v. Reading Co., 226 U. S. 324, 33 S. Ct. 90, 57 L. Ed. 243; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; United States v. Brims [272 U. S. 549] 47 S. Ct. 169 [71 L. Ed. 403]."

We therefore conclude that the necessary facts appear in the bill of complaint to show a cause of action within the purview of the Anti-Trust Law. The motion to dismiss must be denied.

It now remains to consider whether or not, on the facts alleged in the sworn bill, injunction affidavits and counter affidavits, and testimony heard before the court on motion for a preliminary injunction, a situation arises in which the plaintiff needs injunctive relief by preliminary injunction pending a decision on the merits of the case. Without expressing at this time any opinion upon the merits of the case, either in fact or in law, that shall be developed on final hearing, when testimony can be taken in open court, subject to cross-examination, we find from the bill and injunction affidavits that plaintiff does need injunctive relief pending a final decision in this case. A preliminary injunction will therefore issue, as prayed for, except that we are of the opinion that we should not enjoin any of the individual defendants from prosecuting in the courts of the state any appeals now pending in those courts, and we intend merely by this preliminary injunction to restrain the United Mine Workers of America from aiding and abetting to keep in the company houses of plaintiff their present occupants, without re-

gard to the individual rights of the individual concerned.

So far as the National Surety Company is concerned, we undertake to restrain it by preliminary injunction only from going on additional bonds at the behest of the United Mine Workers of America.

Let an order be submitted in accordance with this opinion.