## UTAH–IDAHO SUGAR CO. v. FEDERAL TRADE COMMISSION.

### WOOLLEY v. SAME.

Circuit Court of Appeals, Eighth Circuit.
October 21, 1927.

Nos. 259, 260.

Monopolies ⬅14—Interference with production and manufacture of sugar beets into sugar held not restrainable by Federal Trade Commission; "commerce" (Federal Trade Commission Act, § 5 [15 USCA § 45]).

Production of sugar beets and manufacture of sugar therefrom is not "commerce," and interference with such production and manufacture by sugar manufacturing corporation, to prevent construction of new factories in its claimed sugar beet territory, was beyond the power of the Federal Trade Commission to restrain, under Federal Trade Commission Act, § 5 (15 USCA § 45).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commerce.]

Petition to Review an Order of the Federal Trade Commission.

Petitions of the Utah-Idaho Sugar Company and of Ernest R. Woolley to set aside restraining orders of the Federal Trade Commission directing petitioners and others to desist from certain acts alleged to constitute unfair methods of competition in interstate commerce and conspiring for that purpose. Orders set aside.

Richard W. Young, of Salt Lake City, Utah (D. N. Straup, of Salt Lake City, Utah, on the brief), for petitioner, Utah-Idaho Sugar Co.

Ernest R. Woolley, pro se.

George R. De Bruler, of Washington, D. C. (Adrien F. Busick and Bayard T. Hainer, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, Circuit Judge, and POLLOCK and SCOTT, District Judges.

LEWIS, Circuit Judge. These are suits to set aside a restraining order of the Federal Trade Commission, entered in a proceeding which it instituted against Utah-Idaho Sugar Company, a Utah corporation, and E. R. Woolley (petitioners), and the Amalgamated Sugar Company, a Utah corporation, A. P. Cooper and E. F. Cullen, under section 5 of the Act of Congress known as the Federal Trade Commission Act. USCA title 15, chapter 2. After answers were filed denying the charges of using unfair methods of competition in interstate commerce and conspiring for that purpose, an examiner took the

evidence, covering many thousand pages, which has been condensed to 1,500 pages for present use. The Commission made its findings of fact, covering 24 pages of the record, and entered its conclusion on October 3, 1923, that the facts found established the charge that the two corporations and Woolley and Cooper (Cullen not having been served) were guilty of said unfair methods; and on the same day it entered its order—

"* * * That the respondents, Utah-Idaho Sugar Company and the Amalgamated Sugar Company, each of them and their officers, agents and employees and E. R. Woolley and A. P. Cooper, shall forever cease and desist from conspiring or combining between and among themselves to maintain or retain the monopoly of corporation respondents hereinbefore set out; to prevent the establishment of beet sugar enterprises and the building of sugar factories by persons or interests other than said corporation respondents, and to hinder, forestall, obstruct or prevent competitors or prospective competitors from engaging in the purchase of sugar beets, and in the manufacture and sale of refined beet sugar in interstate commerce, and from effectuating or attempting to effectuate such conspiracy and combination:

"(1) By respondent corporations allocating to themselves certain territory and establishing interstate territorial division lines to be observed by and between themselves in the obtaining of sugar beets and the building of beet sugar factories for the purpose of unlawfully protecting the said respondent corporations against competitors who may endeavor to come into such allocated territory for the purpose of obtaining sugar beets and for the purpose of building factories for the manufacture of beet sugar.

"(2) By intimidation, untruthful statements or otherwise, preventing, hindering or attempting to prevent or hinder the Dyer Company, a corporation of Cleveland, Ohio, a manufacturer of beet sugar factory machinery and builder of beet sugar factories in the United States or any other such manufacturer, from engaging in interstate commerce in selling, building and equipping beet sugar factories for competitors or prospective competitors who are engaged or who are about to engage in the purchase of sugar beets and the manufacture and sale of refined beet sugar in interstate commerce.

"(3) By using their financial power and influence so as to cause banks and others to refuse credit to and to discourage competitors and prospective competitors from engaging in the purchase of sugar beets and the man-

ufacture and sale of refined beet sugar, in interstate commerce.

"(4) By using the financial power and influence to purchase land and erect factories in the territory where competitors or prospective competitors intend or shall undertake to start in the business of purchasing sugar beets and of manufacturing and selling refined beet sugar in interstate commerce, when such purchases or erections are not done in good faith and for no other purpose than to forestall, obstruct and prevent competitors and prospective competitors from engaging in the business of purchasing sugar beets and of manufacturing and selling refined beet sugar in interstate commerce.

"(5) By inducing beet growers to break or cancel contracts for the production of sugar beets for competitors or prospective competitors, by promises to build sugar factories when said respondent corporations have no intention of constructing same but make such promise solely for the purpose of causing breach of contracts for said production in order thereby to prevent or hamper the building of prospective competing factories or the operation of existing competing factories.

"(6) By circulating and publishing false, misleading and unfair statements concerning the machinery and equipment of competitors' or prospective competitors' factories, or the fitness of such machinery to successfully manufacture refined beet sugar.

"(7) By circulating and publishing false, misleading and unfair statements concerning the (a) ability of competitors or prospective competitors to get and pay for beet seed; (b) adaptability to raising sugar beets on land or territory in the localities where competitors are located or are intending to locate; (c) ability of competitors or prospective competitors to pay producers or growers for sugar beets contracted for or delivered to them.

"(8) By making untruthful and unjustifiable statements against competitors or prospective competitors to induce, persuade and influence United States government departments and agents, for the purpose of causing said governmental departments or agents to use their power and authority to prevent the building of factories for the manufacture and sale in interstate commerce of refined beet sugar by competitors or prospective competitors.

"(9) By offering to advertise in newspapers circulating in the localities of the states of Utah, Idaho, Oregon and Montana or elsewhere, where competitors operate or prospec-

tive competitors intend to build and operate beet sugar factories, with the understanding that editorial policies shall be in favor of corporation respondents as against competitors in regard to the beet sugar industry.

"(10) By inducing beet growers or others, through false, unfair and misleading statements, to withdraw their support from, and to breach contracts for the growing of sugar beets with, competitors and prospective competitors in the manufacture and sale in interstate commerce of refined beet sugar, thereby depriving said competitors of, or hampering them in, the ability to compete with corporation respondents.

"(11) By circulating and publishing false, misleading and unfair statements concerning the financial standing and responsibility of competitors or prospective competitors for the purpose of preventing or hampering the sale or disposition of the stocks, bonds and promissory notes of such competitors or of otherwise causing said competitors financial embarrassment.

"(12) By financing and furnishing money to secret and undisclosed agents or employees for the purpose of inciting financial trouble and embarrassment to competitors or prospective competitors by purchasing or acquiring secretly the whole or a controlling interest in the business of competitors or prospective competitors who are engaged, or who intend to engage, in the manufacture and sale of refined beet sugar in interstate commerce.

"(13) By financing and furnishing money to secret and undisclosed agents or employees for the purpose of annoying, harrassing and eliminating competitors and prospective competitors by instituting unjustifiable and groundless litigation and law suits.

"(14) By circulating false, misleading and unfair statements in writing or orally concerning the honesty, integrity, or ability of the promoters, officers, or employees of competitors or prospective competitors engaged in or about to engage in the purchase of sugar beets and the manufacture and sale in interstate commerce of refined beet sugar.

"(15) By utilizing any other equivalent means not hereinbefore stated of accomplishing the object of unfairly preventing, forestalling, stifling or hampering the business of competitors and of those about to compete with corporation respondents in the purchase of sugar beets and the manufacture and sale of refined beet sugar in interstate commerce."

The Utah-Idaho Sugar Company was organized in 1907, being a consolidation of three other sugar companies which owned and operated factories for the manufacture

of beet sugar at Lehi, Utah, Idaho Falls and Nampa, Idaho. At the time of the hearing Utah-Idaho Sugar Company owned and operated eleven beet sugar factories, seven of which were in the state of Utah, one in Idaho and three in Washington. The Amalgamated Sugar Company owned and operated seven factories, four in Utah and three in Idaho. From time to time, beginning with the year 1915, and for some four years thereafter, other parties proposed the building and operation of beet sugar factories in Utah and Idaho in the same territory, in most instances, in which the Utah-Idaho Company or the Amalgamated Company owned and was operating a factory.

We think the proof taken by the examiner may be broadly characterized thus: Evidence tending to show that the Utah-Idaho Company was opposed to the building of other factories in its claimed sugar beet territory, and the Amalgamated Company was opposed to the building of other factories in its claimed sugar beet territory, and that both of those companies used obstructive methods for the purpose of preventing the building of said new factories by others. The preventive methods used were: (a) By the field men of those two companies, whose duty it was to obtain contracts from farmers to raise sugar beets and deliver them to the factory of one or other of said companies, representing that the proposed new factory would not be built, that its proponents were without funds for that purpose, that contracts of farmers with field agents of the proposed new factory would not be carried out by it, that the proposed new factory was to be constructed, in some instances, out of old, secondhand machinery, and for that reason it could not successfully make beet sugar, by statements on the part of said field agents that one or the other of said two old companies would see to it that said new factories were not built, by said field agents invading the territory immediately surrounding the proposed location of said new factory and attempting to make contracts with farmers in order to prevent the field agents of said proposed new factory from making contracts with them; (b) by the activity of officers of one or the other of said two old companies in ascertaining the name of the contractor who was to build said proposed new factory or factories and then using persuasive means to prevent the making of contracts for the construction of the new factories, by discouraging the purchase of stock in the company promoting said new factories, by efforts to prevent the obtaining of credit at banking institutions by said new

companies, and by the allocation of territory in which said two old companies should operate and prevent establishment of new factories therein by the means aforesaid, and by other acts and threats on the part of the officers, agents and employees of the two old companies tending to discourage the construction of new factories in or adjacent to territory occupied by factories of either of the old companies, or in territory within said states which either of them intended later to develop in the beet sugar industry by a factory to be constructed by one of them. Some of the proposed new factories were constructed and put in operation, and some of them were later purchased by one or the other of said two old companies.

It is not claimed that the proof showed any interference on the part of the two old companies with the marketing and disposition of the product of the new factories, nor did the Commission make a finding to that effect, nor do we think there is any proof of interference on the part of the two old companies, their representatives and agents with the purchase and acquisition in interstate commerce of sugar beets or beet seed for any of the new factories. It may be seriously doubted whether some of the specific findings of fact are supported by the proof, but we think the general aspect of the situation, and the conduct of the two old companies in obstructing the establishment of new factories are well sustained. It seems clear that they were strongly opposed to the erection of new factories by others within the territory which they had developed in the beet sugar industry, or at all adjacent to that territory. The business was somewhat new and unusual in character. It required expert knowledge, first, in analyzing the soil to ascertain whether it was adapted to the growth of sugar beets; second, in ascertaining the extent of acreage that was fit for that purpose to justify the erection of a factory; third, in ascertaining that a sufficient supply of water for irrigation of the growing beets could be had; fourth, in inducing farmers to make contracts that they would grow the required acreage; fifth, in teaching them the proper method of cultivating and irrigating the crop; and then, sixth, to make an estimate of the whole situation in order to see whether it would be practicable to make the outlay for the construction of a factory in the particular locality. The two old companies likely felt that they and their predecessors, being pioneers in the beet sugar industry in the states named, were entitled to some kind of priority because of their preliminary inves-

tigations and expenditures and the chances which they took in early development, and there is suggestion that some of the new promotions were not in good faith, but with an ulterior purpose. It further appears that some of the promoters of the proposed new factories were uninformed on the subject of growing sugar beets and manufacturing them into refined sugar, that they were without means of their own to finance their proposed factories, that some if not all of the proposed new factories would be so located as to encroach on territory then tributary in the raising of sugar beets to factories of the two old companies, and in that event there would not be sufficient production to justify the operation of two plants. We are not, however, concerned with the reasons which actuated the two old companies in their opposition, unless they were incentives for acts which interfered with interstate commerce by the use of unfair methods of competition in that commerce.

Commissioners Van Fleet and Gaskill dissented from the making of the order on the facts found, supra. They set forth their reasons in an opinion found in the record, and as we are persuaded that the views which they expressed are sound we make these excerpts:

"In this case the respondents are engaged in the manufacture and sale of beet sugar. The sugar is sold in interstate commerce. The manufacture is intrastate. This proceeding is based on section 5 of the Federal Trade Commission Act [15 USCA § 45] which declares unlawful unfair methods of competition in commerce. The fact that respondents are engaged in commerce in selling sugar produced has no bearing on the case for the reason that the proof does not show any acts of unfair competition in such product. The fact that a respondent is engaged in commerce is not material unless the acts charged have to do with such commerce or that of its competitors in such commerce. The acts to which the proof is directed are concerning only the manufacture. The manufacture of sugar from beets is somewhat peculiar in that it is necessary to have the factory located where beets may readily be obtained by short haul. It is not profitable to ship the beets a great distance to the factory. The acts to which the proof is directed consisted in the effort of respondents to prevent competing factories being located in contiguous territory where they might absorb a part of the supply of beets to respondents' factories. It was at most a prevention of competition in

the purchase of the raw material for manufacture within the state, and, in no case does the proof show an interference with the transport of beets from one state to another, or an interference with the purchase thereof.

"It is well settled that production and manufacture is not commerce. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325; Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 S. Ct. 120, 46 L. Ed. 171; McCluskey v. Marysville & Northern Ry. Co., 243 U. S. 36, 37 S. Ct. 374, 61 L. Ed. 578; Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U. S. 134, 39 S. Ct. 237, 63 L. Ed. 517; The Coronado Case, 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724.

"The fact that an article in process of manufacture is intended for export to another state does not render it an article of interstate commerce. Crescent Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166. * * *

"In the present case there is no commerce to obstruct until the beets are manufactured into sugar and such sugar has been placed in transport. The argument is however, as stated above, that the acts here cut off at the source such commerce. It is only such acts as *directly* interfere with commerce which come under the federal jurisdiction. The line must be drawn somewhere, else all jurisdiction in trade or production would become federal. Hence Congress has not jurisdiction of such acts as only indirectly or remotely affect commerce. In the instant case if interference with the production and manufacture into sugar of beets is an obstruction to a later or unborn commerce in sugar to be made from the beets, one who intrastate sold defective beet seed, thus preventing the production of beets to be manufactured into sugar, would be in commerce, or one who sold fertilizer to raise the seed to plant the beets to make the sugar to be shipped in commerce would be in commerce."

To the cases cited by Commissioners Van Fleet and Gaskill on the proposition that the production of sugar beets and their manufacture into sugar does not constitute interstate commerce, may be added the later case of United Leather Workers' International Union Local Lodge or Union No. 66 v. Herkert & Meisel Trunk Co., 265 U. S. 457,

462, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566, and the cases there cited. We think it clear that the conduct on which the Commission's findings were made went no farther than an interference with the raising of sugar beets and the manufacture of sugar therefrom, and that those transactions were beyond the power and outside the scope of regulation given to the Commission by the Act of Congress under which its order was made. As applied to the facts here, the limitation of that power is nowhere better stated than by Mr. Justice Lamar, in Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346. At pages 20 and 21 (9 S. Ct. 10) of the opinion in that case he aptly said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702 [26 L. Ed. 238] is as follows: 'Commerce with foreign countries, and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the states, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests—interests which in their nature are and must be, local in all the details of their successful management.

"It is not necessary to enlarge on, but only to suggest the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details."

In short, it is our conclusion that the facts found by the Commission present a situation over which it had no jurisdiction and it was without authority to make the restraining order. That order will, therefore, be set aside, and an order of this court may be entered accordingly.